UNITED STATES, Appellee

v.

JOHN W. HEIMS, Private, U. S. Army, Appellant

3 USCMA 418, 12 CMR 174

419

LT COL James C. Hamilton, U. S. Army, CAPT William C. Irby, Jr., U. S. Army, and 1ST LT James A. Hagan, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, MAJ Irvin M. Kent, U. S. Army, and 1ST LT Ivan D. Fugate, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Heims, was convicted, following trial by general court-martial in Korea, of the willful disobedience of a lawful order of a superior noncommissioned officer, in violation of Article 91, Uniform Code of Military Justice, 50 USC § 685. The conviction was approved by the convening authority, and has also been affirmed by a board of review in the office of the The Judge Advocate General, United States Army. On petition of the accused, this Court granted further review, limited to the following two questions:

"1. Whether the law officer improperly restricted cross-examination of prosecution witness McKenzie.

"2. Whether the law officer was required to instruct the court on physical ability to obey the order."

We shall consider initially the second of these questions.

## II

Is physical inability to carry out a military order a defense to a charge of willful disobedience of ▪ the order in question? We are aware of no provision of the Manual for Courts-Martial, United States, 1951, which deals with the problem directly and explicitly, nor has our attention been directed to any by counsel. However, we are sure that it must be so considered—for, if the recipient of an order is *in fact* unable to comply therewith, he cannot be deemed to have evinced that "intentional defiance of authority" at which the proscription of the statute is directed. Manual, supra, paragraphs 169*b*,

170*a*. See Winthrop, Military Law and Precedents, 2d ed., 1920 Reprint, page 572. Incapacity, of course, may be— to some extent, at least— ▪ a matter of degree. In the case of a soldier directed to dig a ditch, would he—to escape responsibility for disobedience by reason of some physical shortcoming—be required to show, say, the loss of both hands? Certainly not. Inability in such a setting must, we think, be weighed in the balances of reasonableness. This approach would of necessity require consideration, not only of the fact and extent of the injury, but as well of its relation to the task imposed, or other subject matter of the order, together with additional relevant circumstances, if any. Whether one may —in law and fact—be physically unable to comply with an order will vary somewhat, we believe, with the pressing nature of the circumstances involved. In view of this essential element of reasonableness, it seems impossible to formulate a general rule for application to all cases. Perforce each must rest largely on the conclusions of the triers of fact, reached after a consideration of all of the evidence presented, together with the realities of the situation as evaluated by rational military persons, and against a background of the transaction's total setting. Because of the stern necessity for preserving discipline in the armed services, the proper application of this test of moderation must include not merely the question of whether the accused, under all of the circumstances, acted reasonably, but in addition, whether the balance of his judgment in the premises *was clearly demonstrable*—only a dif-

420

ference in degree perhaps, but a selective and important one.

We now direct our attention to the question of whether the law officer here was required—in the absence of specific request—to furnish the court with appropriate instructions on the affirmative defense of physical incapacity. Assimilating the present problem to our treatment of others involving affirmative defenses and related matters, we do not hesitate to say that such instructions are required *sua sponte* where the presence of physical incapacity is fairly raised by the evidence. United States v. Ginn, 1 USCMA 453, 4 CMR 45, decided July 10, 1952; United States v. Miller, 2 USCMA 194, 7 CMR 70, decided February 13, 1953.

It has been suggested that an instruction of this nature is necessarily included within one to the effect that the disobedience charged must have been willful. That is to say, a reasonable court-martial would inevitably refuse to find an act of disobedience to have been willful, if it was shown that the accused was physically incapable of compliance. However, this suggestion is opposed to the rationale of the decisions of this Court in previous analogous cases. We have declined, for example, to hold that an instruction having to do with specific intent necessarily requires evaluation of the effects of intoxication, and have ruled that the latter must be the subject of separate and specific instructions, if reasonably raised, despite its extremely close relationship to the matter of intent. United States v. Miller, supra, and cases there cited. Likewise, we have held that an instructional reference to "cowardly conduct" in a case involving a violation of Article 99 of the Code, supra, is insufficient to apprise the court-martial that it must be established that the actions of an accused were the product of *fear*. United States v. Soukup, 2 USCMA 141, 7 CMR 17, decided January 23, 1953. It is quite true that there is to be found in our opinion in United States v. Stout, 1 USCMA 639, 5 CMR 67, decided August 27, 1952, certain broad language inconsistent with our present holding. However, it is clear that the question involved here was not before us under the issues of that case. Stout's petition was granted that we might consider two matters only: (1) the sufficiency of the evidence and (2) the possible presence of a lesser included offense. In the present case one of the specific issues was "Whether the law officer was required to instruct the court on physical ability to obey the order." Moreover, the evidence in the *Stout* case fell far short of raising the existence of genuine physical incapacity on the part of the accused, and we so held. For this reason, the language used there was wholly unnecessary to the determination of the case. Consequently, now that the question is before us, and its resolution is necessary to our decision, we feel entirely free to examine the subject anew.

The issue then becomes one of whether the defense of physical inability was fairly raised by evidence in this case. We do not hesitate to say that it was. The order issued accused by an Army sergeant required that he tie sandbags. The accused testified that he warned the sergeant that he could not comply by reason of an injured hand. It was established that he had, in truth, received a substantial hand injury some eight days before the date of the incident in question, when a shell exploded as he was engaged in cleaning a machine gun. The fact, nature, and extent of the injury were the subjects of extensive medical testimony. There was evidence, on the one hand, that accused was able to perform certain undiscriminative sorts of duty, but that he was unable to accomplish tasks requiring manual dexterity, coordination, and precise manipulation. On the other, there was testimony to the effect that he failed signally to assign his injury as the reason for the refusal to tie the sandbags. In addition, there was evidence tending to show that he could, in fact, perform this particular chore with competence. These conflicts in the evidence, however, raise problems of credibility beyond the province of this Court. United States v. Slozes, 1

USCMA 47, 1 CMR 47, decided November 20, 1951; United States v. Strong, 1 USCMA 627, 5 CMR 55, decided August 27, 1952; United States v. Stewart, 1 USCMA 648, 5 CMR 76, decided August 29, 1952. Accused's testimony —and especially as corroborated, even in part—was sufficient indeed to raise squarely the issue of physical incapacity. United States v. Simmons, 1 USCMA 691, 5 CMR 119, decided September 26, 1952. His story was not inherently improbable certainly, and the fact that there was contradictory evidence did not destroy its evidentiary value. We conclude, therefore, that the law officer's failure to instruct appropriately as to the legal consequence of physical disability under the instant charge was error. Manifestly, too, this failure was prejudicial to the substantial rights of the accused, and requires that the conviction be set aside and that a rehearing be ordered.

### III

The remaining question relates to the scope of cross-examination in trials by court-martial. At the present trial, the sergeant who issued the order in suit was called as a witness for the prosecution. As such, he testified to the fact that the order was given, and that the accused refused to obey it. The witness said nothing of the assignment of a reason by the accused for his refusal. On cross-examination, defense counsel elicited from the sergeant an admission to the effect that the accused had, in fact, said that he *could not* comply with the order—in contrast to the witness' previous testimony showing that accused had said that he *would not* conform thereto. The sergeant then proceeded to relate that accused ascribed as his reason for refusal to assist in sandbagging the commanding officer's bunker, the fact that the latter had not assisted the accused in the construction of his own—that is, accused's—bunker. Thereupon, defense counsel, through appropriate interrogation, drew from the sergeant a statement that he was aware of the injury to accused's hand. At this point, trial counsel objected on the ground of im-

**422**

materiality. The law officer observed that defense counsel had exceeded the scope of the direct examination, and required that he abandon the line of questioning then being followed. It is to be noted, however, that the law officer at the time carefully advised defense counsel that it was open to him to call the sergeant subsequently as his own witness.

The permissible scope of cross-examination has been the subject of frequent judicial expression by Federal courts, as well as by those of the several states. Inevitably, conflict and confusion has resulted in generous degree, but a definite trend of decision and thinking is clear. Viewed functionally, the basic rule, in essential form, must of necessity be that cross-examination is limited to the scope of the direct. That is to say, on cross-examination a witness may not be questioned with respect to matters not brought out—opened up— upon direct. Applied too strictly, this approach has often resulted in unnecessary reversals, and has developed needless delays and inconvenience at trial, not infrequently hampering the primary purpose of the hearing—the development and testing of all relevant facts. At the other swing of the pendulum is the rule—followed today in a sharply limited number of jurisdictions, but frequently advocated by text writers—that the cross-examiner should be allowed the widest possible latitude in questioning—even to the point of permitting the introduction of one's own case during the testing period. However, this view, in seeking to remedy the deficiencies of the stricter form of the "scope-of-the-direct" rule, has itself often led to abuse, and—although administratively defensible—is certainly dubious as a matter of theory. As is so frequently the case, the most desirable rule, we believe, lies somewhere between the two poles—and is the very one made manifest in the better reasoned Federal decisions and in paragraph 149b of the Manual, supra:

". . . Cross-examination of a witness is a matter of right. It should, *in general,* be limited to the *issues* concerning which the witness

has testified on direct examination and to the question of his credibility. Counsel often cannot know in advance what pertinent facts may be brought out on cross-examination and for that reason it is to some extent exploratory. Reasonable latitude should be given the cross-examiner, even though he is unable to state to the court what facts his cross-examination is intended to develop. Leading questions may be used freely on cross-examination.

"The extent of cross-examination with respect to a legitimate subject of inquiry is *within the sound discretion of the court*. . . . ." (Emphasis supplied).

The principal part of this language was, it appears, adopted verbatim from the opinion of the Supreme Court in Alford v. United States, 282 US 687, 691–692, 75 L ed 624, 627, 51 S Ct 218. That the extent of cross-examination is a matter resting largely within the sound discretion of the trial judge is now widely accepted among those jurisdictions following the "scope-of-the-direct" rule. Glasser v. United States, 315 US 60, 83, 86 L ed 680, 706, 62 S Ct 457. It is, of course, the view specifically enjoined in paragraph 149*b* of the Manual quoted, supra. Through it, we believe, there may be achieved the soundest solution to the problem, which is, in the last analysis, principally one of trial administration. The trial judge—or the law officer in the military scene—is present personally at the *nisi prius* hearing. He is aware of the need for an orderly procedure, and also of the convenience of the parties, plus the practical and juristic demands of the particular situation. Moreover, he is and must be the genuine head and guiding spirit of the tribunal.

Had we been sitting as law officer in the case at bar, we might well have ruled as he did—or indeed we might, on the other hand, have permitted defense counsel to continue the line of questioning outlined earlier. From the bald pages of the record, we are inclined to believe that the interest of an orderly procedure and the highest purposes of the trial would have been served by permitting the sergeant's cross-examination to continue. However, this is quite beside the point, and by no means requires that we hold that the law officer abused his discretion in ruling in the manner he did. If the exercise of sound discretion means anything, the law officer here did not err. It should be observed, too, that he specifically advised defense counsel that he might recall the witness as his own at an appropriate time.

For the reason assigned in Part II, supra, the decision of the board of review must be reversed and a rehearing ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

This decision is contrary to the rule we announced in United States v. Stout, 1 USCMA 639, 5 CMR 67, decided August 27, 1952. In that case we specifically announced that instructions identical to those in the instant case were sufficient when physical incapacity was raised as an issue. We now seek to escape the effect of the language of that decision by stating it was dicta. Of course, I concede we are free to examine anew or even reverse principles announced in any decision, but consistency has some virtue and we should not overturn previously announced rules of law unless they are clearly wrong.

There are two principal reasons for my dissent. The first is that I do not find the defense of physical disability fairly raised by the evidence. The Court's opinion states otherwise but I believe this is the result of not discriminating between evidence of injury and evidence of incapacity. To make my point clear, there is substantial evidence of a physical injury to the palm of accused's left hand but the evidence does not show that the nature and extent of the injury was such as to render the accused physically unable to comply with the order. It is the latter deficiency which causes me to say that the testimony favorable to the accused, together with every reasonable inference deducible therefrom,

**423**

does not add up to that quantity and quality of evidence necessary to make an issue.

I liken the defense of physical incapacity to the defense of intoxication. In the former it should be necessary for the accused to show that the extent of the injury was such that he was unable, within reason, to comply. In the latter, the evidence of intoxication must be such that the accused was unable, within reason, to comprehend. Judge Brosman in United States v. Backley, 2 USCMA 496, 9 CMR 126, decided May 12, 1953, stated the rule with respect to intoxication in the following language:

". . . Perhaps we should attempt to make even clearer what is in our minds on this subject. This much may be said. Evidence which goes no further than to indicate merely that the accused 'had been drinking,' or that he was 'under the influence of liquor,' is clearly insufficient to require an unrequested instruction on intoxication. At the far swing of the pendulum, testimony or other evidence suggesting that at the time of the alleged offense the offender was the victim of a temporary drunken frenzy, or in what we once described as 'a state of ambulatory stupefaction,' with equal clarity demands such an instruction. These limits, we believe, must be accepted by all. Indeed, it is only the ground between them which is productive of doubt and uncertainty—and perforce of petitions for review by this Court. As to this area, it may suffice to observe that the showing we contemplate as requiring instruction must certainly be one of *intoxication*—and, moreover, intoxication *of a certain degree and sort,* characterized by a discernible relationship to the potential absence of a capacity to entertain specific intent. Although intoxication, at least, must be fairly raised, it must be recognized that this condition involves aspects of quality and pitch, and that not every intoxication will necessarily be deemed by us to demand the instructions outlined earlier in this opinion."

The evidence in this case shows only that accused had suffered an injury in some degree and it seems to fall in a relative grade and sort which, insofar as the case is concerned, can be characterized as less than incapacitating.

This is my resume of the testimony. On March 15, 1952, accused received a powder burn on the palm of his left hand caused by a cartridge case exploding while he was manipulating a machine gun. On the day of the injury he received first aid treatment by a private first class who was substituting for the regular company first aid man. Two days later the regular enlisted aid man treated the wound but he was not concerned about it being serious, let alone disabling, as he determined first aid treatment was all that was necessary. His treatment consisted of the application of some healing salve. From that date until the date of the offense some six days thereafter, the accused made no complaint about the injury and he carried on his regular duties. Those included cleaning and maintaining his machine gun and working on his bunker. The latter form of work was the very type of labor he refused to perform when ordered to do so by the sergeant. As a matter of fact, the injury at the time was of so little importance that the corporal of the machine gun squad selected accused for the work detail without knowing he claimed any disability, and the accused departed for the assignment without making any complaint that he was suffering from any injury although at one point he made mention of encountering some difficulty in tieing his shoes. Some four or five days after the date of his refusal to obey accused reported to the medical battalion clearing hospital for treatment of his hand. There he was given hot and cold contrast baths. The doctor who attended him testified, by stipulation, to the effect that the X-ray picture showed no bony pathology and that the blast injury produced subcutaneous hemorrhages in the hand which could not be observed; but that the injury was such as to impair the functions of the hand and the ability to do work requiring precise finger movement.

The medical testimony leaves the area of rough manual labor such as tieing and working with sandbags untouched, but it is admitted by the accused, and confirmed by every other witness, that he performed his assigned duties as a member of the machine gun squad from the date of the injury until after the time of the offense. He never made any complaint to the corporal in charge of his squad or to the sergeant or anyone else in the company that the condition of his hand interfered with the performance of his duties. To escape the effect of this testimony accused claims the condition of his hand vacillated and that it was better during the times he did his own work—a rather convenient physical disorder. It was not until some four days after the order was issued that he reported on sick call, and the last time the hand was treated before the offense was committed, the aid man was so little impressed with its seriousness that he applied some salve and told the accused he could throw the bandage away. Likewise the corporal of the squad must have been unimpressed with the severity of the injury as it is unreasonable to conclude that he would send one of his members on a labor detail if he was aware of a physical disability which prevented the performance of the contemplated task. In addition, there was no effort made by the accused to determine whether he could carry out the assigned order. He just took it upon himself to declare he was unfit although on that same date he dismantled and cleaned his machine gun and carried out his other duties. When the testimony, facts, and circumstances are totaled together they merely added up to an excuse seized upon by the accused after the commission of the offense to avoid conviction. Every task could be performed except the one ordered and yet we held a reasonable person could conclude there was evidence that the accused could not physically perform it. Perhaps the story told by other witnesses that accused, when informed of the nature of the work, stated "he had been working on his own bunker and didn't see why he should work on the CO's," disclosed the real reason for the refusal. Be that as it may, Winthrop in his work on Military Law and Precedents, 2d ed., 1920 Reprint, page 572, announces the principle that nothing short of physical impossibility will excuse noncompliance. While I need not go that far, I can assert that a refusal to comply cannot be excused unless the accused is so handicapped that he is reasonably unable to perform. No issue arises unless the evidence tends to establish that condition and here it does not.

For purposes of the second part of my dissent, I can concede arguendo that the evidence raised an issue of physical inability to perform. If I concede that, then I must face up to the question of whether there were instructional deficiencies. I have concluded there were not for under the instructions given by the law officer, the court-martial was required to pass on every issue raised by the pleadings and evidence including physical incapacity. There cannot be any question concerning the sufficiency of the evidence as the accused admits he was given an order by a person whom he knew to be a superior noncommissioned officer and that he refused to obey. Every essential element of the offense except willful defiance of authority was conceded by him so that unless his claim that he was physically unable to comply with the order is founded in substance he is guilty of the offense. With the evidence in that posture, accused's defense succeeds or fails on a finding by the court-martial that his refusal was not willful because he was physically unable to comply. Stated a little differently, accused contends he did not have the right of free choice to comply, or refuse to comply, with the order because his injury denied him that choice. That was the narrow issue in the case and I am of the opinion that any reasonable member of a court-martial would know that one does not willfully flaunt the authority of a superior if he is physically unable to perform the tasks he is ordered to do. Implicit in a finding of willful defiance of authority is a finding of ability to perform. Otherwise there is no free choice.

In developing this rule of law we must not be concerned with minor inconveniences and temperamental nice-

ties. Physical inability to perform means something more than trifling aches and pains. Some discomfort may be felt from performing any task which requires physical exertion and in those instances a refusal based on imaginary ills might be considered willful. However, if an injury is of sufficient severity that ordinary men would find it reasonably prevented performance of the duty ordered there is no possibility that they would find the refusal anything but justifiable. A finding of physical ability to comply with an order so blends in with a finding of defiance of authority in not complying that I am convinced when a court-martial is instructed it must find a disobedience to be willful, it is also instructed that it must find the accused had the capacity to obey.

The Court's opinion anticipates some of the arguments supporting my views and announces they are contrary to the rationale of previously decided cases. With this I disagree, but if the Court is right in its comparison then the rationale of those cases is contrary to good law and a new rule should be announced. Certainly, if a court must pass on an issue under the instructions given, it is not error if a law officer fails to require the same finding under different language. For that reason I see a substantial difference between this case and United States v. Soukup, 2 USCMA 141, 7 CMR 17, decided January 23, 1953. In the present instance, the court was required to find on the affirmative defense raised and the members of a court-martial would so understand. In the *Soukup* case that burden was not invoked by the instructions. When an instruction requires a finding on a particular element of the offense, or on an issue raised in de-fense, it matters not the language used by the law officer. The same language can cover both issues particularly when they are hostile and opposed to each other and an accused is not entitled to have an instruction given in any particular manner. It is only when the court is not required to consider and find on an issue that error creeps in. Here the court had to find the accused knew he was refusing, intended to refuse, and that he was a free agent to make that choice before it could return the finding it made. A comparable situation does not arise in those cases dealing with lack of knowledge of superiority. An accused can exercise his free choice and refuse to obey an order without knowing whether it was issued by a superior. A finding that he willfully disobeyed the order does not resolve the question of knowledge and certainly it does not amount to a finding that he knew a superior officer issued the order. There is no reasonable relationship between the two, and while a court-martial could find an accused willfully disobeyed an order regardless of that knowledge, it could not find he willfully disobeyed an order regardless of his physical condition.

One further matter bears mentioning. In this case, the law officer instructed on the lesser included offense of failure to obey. This brings the issue of physical incapacity into bold relief. It is preposterous to believe that the court-martial did not consider accused's physical condition when it had to consider whether he willfully refused to obey or merely failed to obey. Had there been the slightest doubt that the incapacity was real and not feigned, a verdict of the greater offense would not have been returned.