UNITED STATES, Appellee

v.

HAMILTON B. KING, Private First Class,
U. S. Army, Appellant

5 USCMA 3, 17 CMR 3

No. 948

Decided October 8, 1954

Ralph H. Daughton, Esq., Lᴛ Coʟ James C. Hamilton, U. S. Army, and Cᴀᴘᴛ William C. Irby, Jr., U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, MAJ Irvin M. Kent, U. S. Army, and 1ST LT Roderick V. Brown, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This is an appeal from a judgment of conviction following a rehearing. The accused was originally found guilty, by a general court-martial convened in Korea, of cowardly conduct in the presence of the enemy—in that he wrongfully refused to report to his battle station, in violation of Article 99, Uniform Code of Military Justice, 50 USC § 693. He was sentenced to receive a dishonorable discharge, as well as to total forfeitures and confinement at hard labor for fifteen years. Later we reversed that conviction and ordered a rehearing—for the reason that the law officer failed to instruct that fear was a necessary element of the offense charged. See United States v. King, 2 USCMA 397, 9 CMR 27.

On rehearing of the cause at Camp Gordon, Georgia, on June 9, 1953, King was again found guilty of the same offense and sentenced to be dishonorably discharged, to total forfeitures, and to confinement at hard labor for ten years. The convening authority reduced the period of confinement to five years, but otherwise affirmed the findings and sentence. Subsequently, a board of review in the office of The Judge Advocate General, United States Army—deeming the evidence insufficient to sustain a finding that the accused's action was motivated by fear—modified the findings to the following effect: "that the accused did, at the time and place alleged, in the presence of the enemy wrongfully refuse to go to his defensive position on Hill 355, in violation of Article 134 of the Uniform Code of Military Justice." The sentence, as modified by the convening authority, was found to be appropriate and affirmed. We granted accused's petition for review to consider the following issues:

(1) Did the law officer err in failing to give an instruction, *sua sponte*, on physical incapacity?

(2) Was the action of the board of review in finding a lesser included offense under Article 134 legally correct?

## II

During the month of December 1951, the accused was a member of "D" Company, 17th Infantry Regiment, was stationed in Korea, and was assigned as an ammunition bearer to a machine gun squad. This squad was attached to "A" Company, which at the time in question occupied a defensive position on Hill 355, located on the main line of resistance some 1500 to 1700 yards from enemy installations. The hill had been subjected to intermittent artillery and mortar fire. On the morning of December 1 the accused was released from a battalion aid station, where for some five days he had been receiving treatment for frostbitten feet. On being discharged and directed to return to his organization, he "hitchhiked" the approximately six miles to his company area, and reported to the first sergeant in the vicinity of the unit's command post. The sergeant directed him to return to his position on the hill, and—when the accused refused to comply—reported the matter to the platoon commander.

The platoon commander, a Lieutenant Warr, testified in person at the retrial and stated that, on being informed of the incident, he ordered the accused to report to him at the command post; that, when the latter appeared, he directed him to return to his organization; and that he again refused to do so, stating that he was aware of the consequences. The Lieutenant noticed nothing unusual in the accused's physical condition or demeanor. A Captain Coffin, commanding officer of "D" Company, was then summoned and, when the situation was explained to him, gave the accused a direct order to return to his squad. According to the former's stipulated testimony, the accused replied, "I cannot go back and I realize the consequences." The accused persisted in this attitude, although the consequences of his refusal were fully ex-

**5**

plained to him by the company commander. Thereafter, he was placed under arrest.

Having declined to take the stand at the original trial, the accused did so at the rehearing and testified substantially as follows: Sometime before December 1, 1951, he reported to the company aid station for treatment of his foot condition, and was directed to the battalion collecting aid station, where he remained under treatment for approximately five days. On that day he was released and informed by the medical officer that he should return to his unit. After returning to his company area, he reported to the first sergeant immediately, and was ordered to rejoin his squad. He informed the sergeant that he could not comply with the order because he had just returned from the aid station where he had been treated for frostbitten feet, and that he was not capable of going to his position. When the same command was given him by the company commander, he replied that he could not comply for the reason that his feet were paining him—that he was sick and physically unable to return to the hill. After being confined in the division stockade, the accused continued to receive treatment for the same condition, which thereafter improved more or less steadily. Notwithstanding this, he spent most of this period lying on his cot with his feet exposed to the air in accordance with medical instructions. Because of this disability it was necessary for others to bring his meals to him—for the mess hall was approximately one mile away, and to have traversed that distance he would have been required to walk clumsily on his heels. He stated that at his original trial his defense counsel would not permit him to take the stand for the purpose of testifying in his own behalf.

In addition to the accused's testimony, the defense introduced medical evidence to the effect that on or about October 29, 1952—some eleven months after the commission of the present offense—the accused reported for sick call at Camp Gordon, Georgia, and informed the examining physician that he had suffered from frostbitten feet in Korea. Although the latter found no specific symptoms of that malady, he did discover that there were substantial calluses on the accused's feet which "go hand in hand" with frostbite. This physician testified that a special low-quarter shoe had been prescribed for the accused's use instead of the usual boots. The Government called no rebuttal witnesses.

### III

Relying on our decision in United States v. Heims, 3 USCMA 418, 12 CMR 174, appellate defense counsel contend that this evidence served fairly to raise the issue of physical incapacity, and that the law officer erred in failing to furnish the court-martial with an instruction embracing this aspect of the defense. In the Heims case we held that where the evidence reasonably raises the question of whether an accused is physically capable of obeying the order of a superior officer, it is prejudicial error for the law officer to fail to instruct on the issue *sua sponte*. We laid down the principle there that, when a military person relies on physical incapacity as a defense, he must act reasonably, and the balance of his judgment in this particular must be demonstrated clearly by the record. During the course of the opinion, we observed:

". . . Whether one may—in law and fact—be physically unable to comply with an order will vary somewhat, we believe, with the pressing nature of the circumstances involved. In view of this essential element of reasonableness, it seems impossible to formulate a general rule for application to all cases. Perforce each must rest largely on the conclusions of the triers of fact, reached after a consideration of all the evidence presented, together with the realities of the situation as evaluated by rational military persons, and against a background of the transaction's total setting. Because of the stern necessity for preserving discipline in the armed services, the proper application of this test of moderation must include not merely the question of whether the accused, under all of the circumstances, acted reasonably, but in ad-

dition, whether the balance of his judgment in the premises *was clearly demonstrable*—only a difference in degree perhaps, but a selective and important one."

By means of this language, it is clear that we intended to place an accused under a somewhat heavier burden as to "reasonableness" in raising the issue of physical incapacity than that demanded generally to render a *sua sponte* instruction obligatory on the part of the law officer. In United States v. Heims, supra, the accused was charged with willful disobedience of the lawful order of a superior noncommissioned officer. Some eight days before the issuance of the order there in question, the accused had sustained an injury to his hand when a shell exploded while he was cleaning a machine gun. He received first aid on the day of the wound and periodical treatment thereafter until the date of the alleged violation. The order given by his sergeant required that he tie sandbags for the construction of a bunker—an assignment involving some degree of manual dexterity and precision. There was medical testimony dealing with the extent of the accused's injury and its effect on his ability to use his hand—and particularly his fingers. The accused testified that he was unable physically to perform the task. Essentially that case posed two questions. The first was whether the accused had received an injury; the second whether the record demonstrated clearly the reasonableness of his view that he was thereby prevented from complying with the order. There we answered both questions in the affirmative, and we believe that similar responses are required in the case at bar.

At the outset we observe that the fact of injury cannot be questioned. Lieutenant Warr testified that the accused had returned from hospitalization on the very morning in question, and the latter stated that he had been treated for frostbite for the five days immediately preceding that on which he had received the several directions from his superiors. There is no evidence of any nature tending to negate the existence of the physical disorder which the accused contends demanded his refusal to obey. We therefore address our inquiry to the issue of whether the record sufficiently demonstrates that the accused was thereby rendered incapable of complying with the order in question.

The accused testified that when he first experienced difficulty with his feet, he reported to the company aid station behind his defensive position at the base of Hill 355. Because his injury was thought to be too severe for proper treatment by the attendants at this medical post, he was dispatched to the battalion collecting station at the rear. There he was provided with medication for some five days before being released for duty. He then returned to the company command post. When ordered to go to his unit, he "told the First Sergeant that I can't go back up on the Hill . . . and I told him that I had just arrived from the aid station for frozen feet and I wasn't able to go back up." According to his undisputed testimony, he assigned substantially the same reasons to his company commander when ordered by the latter to rejoin his squad. Following his imprisonment in the division stockade, he "had considerable trouble" with his feet and again reported for sick call two days after his arrival there. The medical officer at the stockade told him to soak his feet and to keep them exposed as much as possible, for they "were in very bad shape." His sojourn in the stockade thereafter is described in the accused's words:

". . . I stayed there on my bed —cot there in the stockade—and I stayed there for a period of about three weeks on my back like that, and I couldn't walk, and they just had to bring my food to me. Else, if I had to go to chow, I had to walk on the back of my heels like this. Something like a mile to chow from the stockade."

It is not without significance that there is an absence of direct evidence in the record tending to show that the accused engaged in walking to any appreciable extent following his release from the battalion aid station. "Hitchhiking" back to the company area cer-

7

tainly involved little pedal effort, and there is nothing to show that at any time he walked to the mess hall for his meals after arriving at the stockade. Indeed, his testimony is distinctly to the contrary. Some corroboration for his claim of physical incapacity appears in the stipulated testimony of the company commander who stated that, when ordered to return to the hill, the accused replied, "I *cannot* go back." (Emphasis supplied.) Moreover, on cross-examination, Lieutenant Warr testified that he could not recall the accused's exact words of refusal, and that it was possible that the latter had said he *could not* return to his position. Further corroboration is found in the testimony of the medical officer who examined the accused at Camp Gordon. In view of the accused's testimony that he had experienced no other difficulty with his feet, it would not have been unreasonable for the members of the court to have concluded that the presence of calluses, sufficiently disabling to require the medical prescription of special shoes eleven months after an alleged case of severe frostbite, constituted a residual manifestation of that very disorder.

In light of these circumstances, we are of the opinion that the defense of physical incapacity was reasonably raised by the evidence. As we stated in the Heims case, supra:

"... Accused's testimony—and especially as corroborated, even in part—was sufficient indeed to raise squarely the issue of physical incapacity. United States v. Simmons, 1 USCMA 691, 5 CMR 119, decided September 26, 1952. His story was not inherently improbable certainly, and the fact that there was contradictory evidence did not destroy its evidentiary value."

In this connection it must be remembered that, unlike the court-martial, we are not concerned with the credibility of witnesses nor the weight to be accorded their testimony. Rather—in view of the principle enunciated in the Heims case—we are required to determine whether, as a matter of law, the balance of the accused's judgment with respect to physical incapacity was sufficiently demonstrated by the record as

to raise that defense. On the whole we are inclined to the view that it was. True it is that the instant situation falls peripherally, rather than centrally, within the ambit of Heims. Nevertheless that decision must be deemed to control. It follows that the law officer's instructional failure constituted prejudicial error necessitating reversal.

## IV

Mindful of the protracted history of this case, we shall comment on the second issue—despite our reversive action with respect to the first. Recently we have held that the offense of cowardly conduct, alleged under Article 99 of the Uniform Code of Military Justice, cannot—through the deletion of the element of fear—be reduced to an offense violative of Article 134. United States v. Hallett, 4 USCMA 378, 15 CMR 378; United States v. Hamilton, 4 USCMA 383, 15 CMR 383. Therefore, at a rehearing the charge should not be laid under the latter Article. At the same time, we are inclined to believe that, within the rationale of Hallett and Hamilton, supra, the findings, as modified by the board of review, may fall within the purview of Article 86, 50 USC § 680.

In the interests of clarity, however, and to avoid further difficulty with the case, we believe that any retrial which may be held should be based on charges drafted expressly to fall within Article 90, 50 USC § 684, as alleging King's disobedience of the order from superior authority to go to his defensive position. The disobedience of this order—if illegal disobedience there was—constituted the essence of any wrongfulness in the refusal to go. Upon such retrial, the maximum sentence would come to five years' confinement at hard labor—with credit for confinement under previous sentences.

## V

The issue of the accused's veracity can be determined on the retrial of this case under proper instructions—as well as on the basis of the findings on any charges the Government may later

choose to bring under Article 131 of the Code, supra, 50 USC § 725. However, we are not justified in proclaiming that, in the case at bar and as a matter of law, the accused could not be believed under oath. In itself, his testimony is not inherently incredible, nor was it shown to be contrary to any of the physical facts. The sole issue before us has to do with the sufficiency of the testimony to raise an issue requiring instruction. As to that issue, we must hold that the record contains evidence sufficient to raise reasonably the matter of physical incapacity. Cf. United States v. Lamerand, 4 USCMA 702, 16 CMR 276. Therefore, the case is remanded to The Judge Advocate General, United States Army, for disposition in accordance with this opinion.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

I have three points upon which I disagree with the majority of the Court. First, I do not believe we should direct the Army to redraft specifications under any particular charge as I know of no reason why an absence without leave specification should be eliminated. Second, the Court's opinion places an arbitrary ceiling of five years on any future sentence that may be imposed and I question our authority to limit the sentence except as provided by the Code. Third, the facts do not remotely bring this case within the ambit of United States v. Heims, 3 USCMA 418, 12 CMR 174.

I shall discuss only the third point of disagreement; but before doing so, I desire to comment upon the reference in the majority opinion to the offense of perjury. The reason for interjecting that issue into the case seems a confession of weakness and must arise because my associates have doubts about the truthfulness of the story now related by the accused. There is, of course, good reason for those doubts and they arise from the history of the case. Unless the present defense is a post-trial fabrication, one of the two following situations was present in the prior proceeding: (1) Counsel representing the accused on the first trial is guilty of practicing a gross fraud on the court-martial; or (2) the accused failed to inform his counsel at that hearing of a readily available and easily provable defense. Certainly the probabilities lead me—and apparently my associates—to place little credence in the newly discovered theory. My reasons may be found in the perfectly unbelievable story related by the accused. The offense in this case was committed on December 1, 1951. According to the accused's story, some five days prior thereto he was hospitalized for frozen feet. He was ordered to return to duty, which he did; upon being directed to join his squad he was unable to comply because of his physical condition. He was incarcerated in the division stockade, treated by a division doctor, and was unable to leave his bunk for some three weeks. During this time it was necessary that food be carried to him. Charges were preferred against him within six days after the offense was committed and the Article 32 investigation was completed at a time when, according to his story, he was unable to walk except on his heels. He was tried within three weeks after he could ambulate and the trial was held near the situs of the offense—if the evidence now related by accused is in fact true. The officers who manned the court were all on duty with units of the Third Infantry Division to which the accused belonged, were familiar with weather conditions, and could have been shown the residual effect of the frostbite. In addition, there were official records readily available at his company headquarters, at the Battalion Aid Station, and at the division stockade which would have corroborated his claimed physical disorder. Furthermore, other personnel confined in or operating the stockade, who associated with and serviced accused during his illness, were readily available; and many other avenues of evidentiary approach were wide open to the accused to prove his claimed defense. The record of the first trial shows a complete absence of any testimony, directly or inferentially, or any assertion of any kind, suggesting physical incapacity as the reason for disobeying the order. The first time there is

**9**

the slightest suggestion of any such defense appears at the second trial which was some eighteen months after the offense had been committed.

The accused on the second trial offers the explanation that his counsel refused to permit him to testify at the first hearing. That, of course, leaves entirely unmentioned any reason for the absence of all of the evidence which would have been introduced by other witnesses or records had the accused's story been disclosed to his defending counsel. Moreover, an unsworn statement by the accused, or by his counsel, in extenuation and mitigation could have been offered at the first trial without subjecting the accused to the ordeal of cross-examination. Obviously, it follows that if any of the information now appearing in the record had been disclosed to defending counsel and he had done no more than he did on the first trial, his right to practice before military courts should be forever withdrawn. Of course, I do not believe that any such disclosure was made and neither do I believe that defending counsel was so derelict in his duty that he would refuse to disclose facts for defensive or extenuating purposes. No wonder counsel at the second trial found it expedient to waive final arguments if counsel for the Government would waive opening arguments.

So that no one will accuse me rightly of attempting to decide a case solely on conjecture or speculation, I pass on to consider matters of more importance to this decision.

My associates have gone to extraordinary lengths to find corroborative evidence and thus bring this case within the principles we announced in United States v. Heims, supra. In so doing, I think they have trespassed in fields of uncertainty and doubt and have drawn inferences which are not supportable by the record. I will not prolong this opinion by a reference to all as a few will establish my point. In support of my first departure from my associates, it is to be remembered that a base for a conclusion in a military case may, in part, depend on tactics and the tactical situation. A failure to consider testimony of a witness in light of those factors may bring about a misconception. By way of illustration, I merely point out the following thought suggested by the Court and one to which I cannot subscribe: "'Hitchhiking' back to the company area certainly involved little pedal effort." The members of the court-martial because of their knowledge of an extraordinary tactical situation might be able to arrive at that conclusion, but I cannot do so. I suppose the reason the author judge wanders into that field of uncertainty is to counter any inference that the accused was in such physical condition that he could comply with the order given. I further suppose that the author judge, for the purpose of that statement, accepts the accused's story. If my last assumption is correct, the accused had been in the battalion aid station; he was found physically fit by the doctor on duty there; he had been ordered to return to duty; and he hitchhiked from the battalion aid station to the company command post. It may well be that the Army has rewritten its tactical doctrine; but, offhand, I would say that when a company command post is within range of enemy small arms and artillery fire personnel do not, during daylight hours, have "door to door" delivery by motor vehicle. If they did, I am sure the casualty rate would increase. It seems more reasonable to me to assume that at some appreciable distance short of the installations there would be a dismounting line and personnel would be required to alight and travel on foot.

My second ground of departure challenges the presence of testimony to support the following quotation: "Lieutenant Warr testified that the accused had returned from hospitalization on the very morning in question, and the latter stated that he had been treated for frostbite for the five days immediately preceding that on which he had received the several directions from his superiors." Here is the record:

"CROSS EXAMINATION

* * * * *

"Q Well, it is true isn't it that he had just returned to your platoon after a five-day absence?

A That I don't recall off-hand.

10

"Q If I should tell you that he had been off to the company aid station there for five days under the care of a doctor, could you contradict that?

A That I can't truthfully answer because, as I said, of the time limit involved there.

. . . . . .

"Questions by members of the court:

. . . . . .

"Q Well, can't you—as platoon leader, wouldn't you know whether or not this—something was wrong with this man—whether or not there was anything unusual about his actions prior to the commission of the alleged offense? I mean, the platoon leader when he has a few men there—

A I don't recall anything, Major, about it that would be peculiar about his actions.

"Q Do you have—can you say whether or not the accused had, prior to this time—by 'prior to', immediately prior to—received medication of any kind? Was he on the sick book, we'll say?

A I believe the accused had come back for sick call that morning. Medication that would be involved there I can't say, sir."

Conceding the last answer may be somewhat ambiguous and uncertain, it does not confirm accused's version. A doubtful statement that a person reported for sick call can hardly be converted into a positive assertion that a man has been hospitalized. Moreover, the manner in which the latter part of the quote from the Court's opinion is tied in with the first part makes it susceptible of being construed to convey the idea that the accused made the statement to the Lieutenant that he had been hospitalized for frostbite for five days. Because it might be so interpreted and because I do not believe the author judge had that purpose in mind, I point out that the record does not support that construction. In that connection, it is singular to note that the Lieutenant was the only witness who appeared personally against the accused at the second trial and strangely enough the accused did not testify he made any complaint about his physical condition to that officer. He only complained to

those persons who were not present to refute his story.

One other observation in the majority opinion which is at variance with my views is the one which finds corroboration of physical incapacity from the following statement of the company commander: "the accused replied, 'I *cannot* go back.'" (Emphasis taken from the Court's opinion.) Laying aside temporarily any question about the statement being interpreted as disclosing a mental rather than a physical condition, the quotation is only shown in part. As actually quoted in the stipulation, it reads: "I cannot go back and I realize the consequences." To appreciate the full impact of the complete statement, one must understand that it was made after the accused had refused to join his squad in compliance with an order; that duties at the squad position were much more hazardous than those at the command post; that the company commander made a full explanation of the seriousness of the refusal; that the company commander made no mention of any complaint registered by the accused; and he had given a second directive that the accused must return to the hill. I wonder what consequences accused feared if he was physically unable to comply with the order. I am not unsympathetic to the accused, but I cannot read into his statement a refusal based on inability to walk. Many a person who has been subjected to the horrifying experience of artillery fire cannot go back, but the reason finds root in the mind and not in the feet.

Now to affirmatively approach the question presented by this record. It is to be noted that as I relate the facts and draw my inferences I do not accept negative testimony as corroboration.

The facts are that in December 1951, accused was a member of "D" Company, 17th Infantry Regiment in Korea. His squad was attached to Company "A" which at that time was in defensive position on Hill 355 with the enemy positions located some 1500 to 1700 yards in front. The hill had been subjected to intermittent enemy artillery and heavy mortar fire. Accused was assigned as an ammunition bearer for his

machine gun squad. On December 1, 1951, at 10:30 a. m., he reported to the first sergeant at the company command post. He supposedly had been at the battalion aid station approximately six miles behind his company's position, and after being treated for what he claims was frostbitten feet, he was discharged by the doctor and told to report back to duty. He then left the aid station and hitchhiked back to his company. Shortly after arrival at the command post the first sergeant directed him to return to his squad position on the hill. Accused refused to do so and the platoon commander was contacted and notified of the refusal.

The platoon commander, Lieutenant Warr, testified that on hearing of the incident, he ordered the accused to report to him near the company command post; that accused reported; that he directed him to return to his unit; and that the accused then repeated his refusal to do so. The Lieutenant then gave him a direct order to report back to his position on the hill to which the accused, without giving reason therefor, stated that he would not report and that he was well aware of the consequences. The Lieutenant noticed nothing unusual about the accused's physical condition or his facial expressions. Captain Coffin, Commanding Officer of "D" Company, then came to the command post and when the situation was explained to him he gave the accused a direct order to report back to his squad. The Captain explained the criminal aspects of disobeying his order but the accused again refused to comply, without assigning any reason for his refusal. He repeated to the Captain that he realized the seriousness of his refusal to obey.

The accused did not take the stand as a witness at the first trial but on the rehearing he testified in substance to the following facts: That sometime prior to December 1, 1951, he reported to his company aid station for treatment and was directed to the battalion collecting aid station where he was treated for the condition of his feet for approximately five days. On that date, he was told by the doctor treating him at that aid station to report back to his

unit as he was fit for duty. He "hitchhiked" some five to six miles before he arrived at the company command post. He reported to the first sergeant and within ten to fifteen minutes after his arrival in the company area he was ordered by the first sergeant to return to his squad. He informed the sergeant that he could not comply with the order as he had just arrived from the aid station for treatment for frozen feet and they did not "feel too well." When his company commander ordered him forward he responded that he could not comply with the order for the reason that he was sick; that his feet were bothering him; and that he was not physically able to report to his unit. After being placed in the stockade, his feet began to improve but he did not go on sick call for approximately two days after he was confined. His feet were treated while he was incarcerated and he spent most of his time lying on his cot because he was required to walk approximately one mile for mess and had he traversed that distance on foot he would have been required to walk on his heels.

Defense introduced medical testimony to the effect that on or about October 29, 1952, some eleven months after the offense was committed, the accused had reported for sick call at Camp Gordon in the United States. The accused related to the doctor that he had suffered frostbitten feet, but the latter found no symptoms. The doctor, however, testified that there were calluses on accused's feet which go "hand in hand" with frostbite; but they arise from many causes and he could not determine whether accused had suffered that experience.

In the Heims case, supra, we held that where the evidence raises reasonably the question as to whether the accused is physically capable of obeying an order of a superior noncommissioned officer, the law officer errs prejudicially if he fails to instruct on the issue *sua sponte*. Judge Brosman, speaking for a majority of the Court, recognized the principle that when an accused relies on physical incapacity as a defense he must act reasonably and his judgment concerning his inability to obey must be

clearly demonstrated by the record to be balanced. The opinion in that case stated:

". . . Whether one may—in law and fact—be physically unable to comply with an order will vary somewhat, we believe, with the pressing nature of the circumstances involved. In view of this essential element of reasonableness, it seems impossible to formulate a general rule for application to all cases. Perforce each must rest largely on the conclusions of the triers of fact, reached after a consideration of all of the evidence presented, together with the realities of the situation as evaluated by rational military persons, and against a background of the transaction's total setting. Because of the stern necessity for preserving discipline in the armed services, the proper application of this test of moderation must include not merely the question of whether the accused, under all of the circumstances, acted reasonably, but in addition, whether the balance of his judgment in the premises *was clearly demonstrable*—only a difference in degree perhaps, but a selective and important one."

The violation charged in the Heims case was willful disobedience of a lawful order of a superior noncommissioned officer. The facts were that about eight days prior to the order, the accused had sustained a substantial injury to his hand from a shell which exploded while he was cleaning a machine gun. He received first aid on the day of the injury and periodically thereafter up to the date of the violation. The order was given by his sergeant and it required him to tie sandbags for the construction of a bunker, a task involving some manipulation and dexterity in the use of his hands. There was medical testimony on the extent of the injury and the effect it had on his ability to use his fingers. The accused testified that he could not perform the task. Essentially that case posed two questions. The first was whether the accused had received an injury. The second was whether the record clearly demonstrated that the injury to the hand reasonably prevented compliance with the order. There I dissented and here I do likewise.

I am willing to assume the accused in this instance suffered frozen feet. This assumption is made in spite of the fact that accused alone testified to that effect. Undoubtedly his statements would be sufficient to raise an issue if it were not for the fact that his testimony is inconsistent, rendered improbable by his statements, acts, and conduct, and insufficient to show more than a possible non-disabling injury caused by exposure to cold weather. However, I pass by a development of that principle to consider the second question. The gravamen of that question is whether the record permits a finding that the accused was so incapacitated physically he could not reasonably proceed from the company command post to his squad which was not over 1500 yards away. He so stated, but his conclusion finds no support in the facts. He was released from the battalion aid station on the morning of December 1, 1951, and the incident occurred at 10:30 a. m. the same morning. He was declared physically fit for his duty by a battalion medical officer. Unless that officer failed to discharge his duty properly, his conclusion was that accused's physical disorders would not interfere with his performance of duty and an ammunition carrier in a front line infantry unit must be able to walk. The accused managed to travel some five or six miles and while he may have ridden part of the way he had to walk some of that distance. When he was ordered to move on to his squad, he made no suggestion that if permitted to rest or given some respite or assistance he would make some attempt to continue forward. He just refused to go. He was around the area for a short time before he received the order given by the first sergeant, but he made no complaint about his feet until he was apprised of the fact that he could not remain in the comparative security of the rear echelon. According to the Lieutenant in command of the platoon when he issued his order, the accused did not predicate his refusal on the condition of his feet; and fairly interpreted, the Captain's testimony leads me to believe

**13**

no complaint was made to him. If any complaint had been registered, certainly one of the three persons issuing the three separate orders would have been cognizant of some physical ailment. Yet the Lieutenant was unaware of any physical disorder which was observable and his attention was not directed toward any. The accused had traveled some distance from the rear installation and he refused to make any effort to cover the remaining distance to his squad. It nowhere appears that the end of the journey was more exacting than the first part except perhaps the accused could not ride any of that distance. When he was incarcerated in the compound, he walked a considerable distance for his meals as according to his own testimony, his condition had improved and he did not report for sick call for at least two days after his arrival and the mess hall was approximately a mile from his tent. As a matter of fact, there is no evidence in the record, aside from accused's self-serving statements, that his feet were giving him any discomfort. And his first corroborated declaration to any person to that effect was to a doctor at Camp Gordon after his return to this country and that was some eleven months after the offense. If the accused was basing his conclusion of incapacity on difficult terrain, the record fails to support him. If he was relying on weather conditions, it was just as cold at the company command post as it was at the squad position. If he reports rightly the treatment he was directed to use, which was principally exposure to cold air, he had equal facilities at both places. Even if the accused reported to the first sergeant and the Captain that he was unable to comply, his judgment in that regard must be weighed in the light of this record. Generally stated, that is, within a matter of a couple hours after being found fully fit for duty by a medical officer, he "hitchhiked" to his command post without difficulty, he received an order to move up to his squad less than one-fifth the distance he traveled, and this is the story he claims to have told the first sergeant:

"When I got back my feet were still bothering me—begin to get a little better. I told the First Sergeant that I can't go back up on the Hill and then he asked me why, and I told him that I just had arrived from the aid station for frozen feet and I wasn't able to go back up."

That is the strongest statement in his favor, but in the light of the entire record it falls far short of demonstrating clearly that his judgment was based on reason and not on mere discomfort. Many infantrymen are bothered by their feet but they continue on; and if, as the accused states, he was released from the aid station as physically fit and his feet were getting better, there could be no reasonable justification for his refusal. Even an offer to try was lacking. Tested by the rule in the Heims case, the record in this case does not support a finding that the accused acted reasonably in refusing to comply. That issue should, therefore, be resolved against him.

Defense counsel contend that if instructions on physical incapacity were not required, and if the finding must be reduced to an included offense, failure to repair or dereliction of duty should be considered. My results require an answer to that question. The question presented is not one of affirming a lesser included offense, but one of determining the effect of the action taken by the board of review. As we previously held in the two cases of United States v. Hallett, 4 USCMA 378, 15 CMR 378, and United States v. Hamilton, 4 USCMA 383, 15 CMR 383, the finding made by the board of review is no more nor less than absence without leave. The offense of failure to repair encompasses those transgressions which are minor in nature and that offense is intended to apply when the absence involves the failure to report to perform routine duties. We have previously held it does not apply when, as here, there is a violation of a direct and personal order. Absence without authority is applicable in all instances and it may be the substantive offense when the absence involves the missing of duties which are of substantial importance. Any absence which results in missing troop duty in

the presence of the enemy can hardly be classified as routine, particularly when there is ever present the likelihood of an engagement. Accordingly, the facts found by the board of review exclude the possibility of a holding that failure to repair was the crime affirmed or one raised reasonably by the evidence.

Dereliction of duty presupposes a mere failure to perform assigned military duties and there is more in this case than is suggested by the elements of that offense. The gravamen of the offense found is more than a mere neglect and crimes based on neglects or omissions do not rise to the gravity of the offense affirmed in this case. A factual situation which establishes a wrongful absence by an accused who knows he is needed in combat does not raise reasonably either failure to repair or dereliction of duty. I would, therefore, affirm a finding of absence without leave.