UNITED STATES, Appellee

v.

MICHAEL E. LATSIS, Staff Sergeant, U. S. Marine Corps, Appellant

5 USCMA 596, 18 CMR 220

No. 5327

Decided April 15, 1955

CDR William T. Roddy, USN, for Appellant.
MAJ Charles B. Guy, USMC, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

On December 11, 1953, the accused was tried by a general court-martial in Korea for two offenses: (1) cowardly conduct in the presence of the enemy, in violation of Article 99, Uniform Code of Military Justice, 50 USC § 693, and (2) willful disobedience of the command of a superior officer, in violation of Article 90, Uniform Code of Military Justice, 50 USC § 684. The law officer sustained a motion for a finding of not guilty of the first offense, but the second specification was submitted to the court for its consideration. After having been found guilty of the latter offense, the accused was sentenced to a dishonorable discharge, confinement at hard labor for five years, and forfeiture of $40 a month for a like period. The convening authority approved the finding and sentence but a board of review in the office of The Judge Advocate General of the Navy, after affirming the finding, reduced the sentence to a dishonorable discharge, confinement at hard labor for three years, and forfeiture of $40 a month for a like period.

We ordered a hearing on two of the errors assigned by the accused in his petition for grant of review, and they are:

(1) Was the evidence sufficient to support the finding of guilty?

(2) Was the law officer required to instruct sua sponte on physical incapacity?

To support the first assigned error, appellate defense counsel takes the position that the evidence failed to establish beyond a reasonable doubt that the accused ever knew that his platoon leader ordered him forward into the trench line. He further insists that if knowledge be assumed, arguendo, the petitioner's physical and mental condition were proven to be so impaired that he could not consciously conceive the evil purpose or criminal intent necessary to establish the element of willfulness in the disobedience charge.

## II

These are the relevant facts on the first issue. Some few days prior to July 19, 1953, the accused was examined by a psychiatrist for combat-precipitated disorders, found fit for combat service, and returned to duty. On that date he was on the main line of resistance in Korea, serving with Baker Company, 1st Battalion, 7th Marines. He was a platoon sergeant and his duties required that he be with the forward elements in command of the platoon. During the late afternoon hours on that day, enemy artillery and mortar fire began to drop on the company's right flank. However, only a few mortar rounds fell in the platoon area. After the shelling commenced, the commander of the platoon, Lieutenant Acuff, accompanied by a Sergeant Hall, left the command post bunker and went to the forward elements to check on the enlisted men who were in position in the front trenches. At that time the accused remained in the command post bunker. Prior to the enemy activity, he had been sitting on a bunk smoking and chatting with another sergeant. When the shelling began, he put on a helmet and flak jacket, picked up his rifle, loaded the weapon, and then lay on a bunk. Soon after departing, Lieutenant Acuff, realizing the sergeant was not with his platoon, called the bunker telephone operator and directed that he notify Sergeant Latsis he was wanted by the Lieutenant up in the forward trench line. The telephone operator shook the petitioner and repeated the Lieutenant's order several times, but received no positive response. As soon as his relief appeared, Sergeant Wurster, the telephone operator, went forward to notify the Lieutenant of the accused's failure to respond. On being made aware that all was not well, Lieutenant Acuff, preceded by Sergeant Hall, returned to the command post and found the petitioner still lying in the far recesses of the bunker. When asked what was the matter, the accused told his officer "I don't know." On being informed by the Lieutenant that he had wanted him in the front lines, the petitioner replied "I can't." Lieutenant Acuff then told the accused he would be sent to the sick bay, helped him up, and turned him over to a corpsman. Prior to the Lieutenant's discussion, Sergeant Hall had a conversation with the accused and his version is given in his own language. He stated:

"Q. Do you recall exactly what he said?

A. He asked for Staff Sergeant Latsis to come up to the trenchline and then he told me to go back to the command post bunker; and when I went back there, I saw Staff Sergeant Latsis laying on the deck between the racks with his helmet and flak jacket on; and I stepped over by the racks to get a canteen and Staff Sergeant Latsis says, 'who is this,' and I said, 'Sergeant Hall,' and he said 'Oh', and I went on back over to the desk where the phones are; and when I got where the phones were, Lieutenant Acuff came in and he ran over by Staff Sergeant Latsis and asked why . . .

"Q. You were there at this time?

A. Yes, I was there . . . asked him why he didn't come up to the trenchline like he asked him to, and he said he didn't feel good. And the Lieutenant asked him if he wanted to go to sick bay and Latsis said

598

something like 'yes.' I couldn't remember exactly what it was but I know he got up and the Lieutenant asked Sergeant Brewster and HM3 Prior to take Staff Sergeant Latsis back to sick bay."

Corpsman Prior and Sergeant Wurster assisted the accused to the aid station and according to them, he had little sense of direction, wobbled and tripped several times. A few days later, after having been found physically qualified for duty, the petitioner returned to the platoon only to leave it again in a matter of hours.

The foregoing facts support a finding that the accused had knowledge of Lieutenant Acuff's order. That █ officer testified he had phoned the telephone sergeant and given the order in question. In turn, the Sergeant related that he repeated the order to the petitioner. The latter, however, answered in what sounded to the Sergeant as a mumbled reply. Absent any evidence that accused's hearing was impaired or that noises interfered, the court-martial could consider that evidence as showing a sensory reception by the petitioner. Accused does not affirmatively assert he could not or did not hear, and the record shows otherwise. His acuteness of hearing resulted in his taking personal protective measures and then laying on the floor when the firing first commenced. Prior to that time, he had carried on an ordinary conversation with other personnel. Furthermore, a short time later, while still in the command post, he was able to adequately respond in an intelligent manner to questions asked him by Lieutenant Acuff. Thus, moments before and after the order in question was given, the petitioner's sense of hearing was evidently normal. Pretermitting the medical question later discussed, under those circumstances there is nothing to support a contention that accused did not hear and know about the order issued. His defense was not based on that theory. He relied principally upon the contention that his mental condition was such that, having heard the order, he could not appreciate its legal effect or comply with its requirements.

III

Continuing to the second issue, defense counsel asserts that there was substantial evidence of █ physical inability to comply with the order, and that the law officer was under a duty sua sponte to give the necessary and appropriate instructions on that issue. The evidence touching on that question is as follows:

The battalion psychiatrist testified that he had interviewed the petitioner twice—the first time prior to July 20, 1953, and the second time between July 20 and 27, 1953. On both of those occasions the accused was returned to combat duty by the medical officer who concluded he was fit for that type of service. It was the psychiatrist's conclusion that the accused was able to distinguish right from wrong and to adhere to the right. However, he expressed the opinion that the accused was suffering from combat-precipitated anxiety reaction which made adherence to the right more difficult.

The stipulated testimony of the second psychiatrist which was introduced by the defense is quoted:

"I have examined the records and pretrial statements of the witnesses in the case of Staff Sergeant Michael E. Latsis, U. S. Marine Corps. On the basis of this material it cannot positively be stated that he suffered a degree of anxiety sufficient to render him unable to know right from wrong at the time of the alleged offense. There is, however, some evidence that this may be so. There is sufficient evidence, in my opinion, that his mental state at the time of the alleged offense rendered adherence to the right more than normally difficult."

In addition to the medical testimony several lay witnesses testified about accused's condition. Sergeant Wurster testified: "Sergeant Latsis was more in a shock state, sweating, eyes were shining; all I could hear was a mumble." Sergeant Schuster described him in the following manner:

"Yes, sir. I seen him in the early
**599**

evening, and he was the same as he always was it seemed to me. He was, there was either something wrong with him or he was shook-up or something."

Other witnesses mentioned his urinary urgency.

It is to be noted that while the issue deals with physical incapacity, the evidence touches on mental responsibility. That confusion does not exist in that connection will be established by our subsequent discussion. It is, however, necessary to say at this point that following the introduction of this evidence, and during the course of the law officer's instruction, the necessary instructions on insanity were given to the court for their consideration.

If physical incapacity is reasonably raised by the record, then an error prejudicial to the accused has been committed. In United States v. Heims, 3 USCMA 418, 12 CMR 174, this Court recognized that physical inability to carry out an order was a defense to a charge of willful disobedience. The Court in that case announced the doctrine that an instruction on this subject was required sua sponte where the issue of physical inability was fairly raised by the evidence. It is to be noted, however, that the injury to Heims was a powder burn on the palm of his left hand caused by an exploding cartridge case. Mental incapacity and its effect played no part in that decision. The converse is true here. Direct physical injury is not to be found and any conditions which will exculpate this accused must result from mental infirmities. That this is a typical combat-precipitated psychiatric disorder will be made apparent by our quotations from Department of the Army Technical Manual 8–240, Psychiatry in Military Law.

Paragraph 16 of TM 8–240 is devoted to problems in combat psychiatry. We find some six diagnostic categories set out in that paragraph, but only two are of importance to our discussion. The first is normal combat reactions and they are identifiable by somatic and psychologic symptoms which arise from combat fatigue and fear. The Manual in discussing those goes on to say:

"The normal combat reaction is made up of a variable set of marked somatic and psychologic symptoms which arise from physical fatigue and from extreme, repeated, and continued combat fear. Among these normal reactions may be: muscular tension, with headache; transient 'freezing'; shaking; tremor; marked perspiration subjective feelings of warmth or chilliness; loss of appetite; vague abdominal distress; mild diarrhea; urinary frequency or urgency, by day or night; fast or unusual heart action; breathlessness; feeling of tightness in the chest; faintness or giddiness; generalized muscular weakness and lassitude; mounting anticipatory anxiety; 'on-guard' reactions to combat noises; sleep difficulties; some diminution in drive, flow of speech, initiative, range of interests and general feeling of well-being; irritability; and resentment."

The second category is combat-precipitated psychiatric disorders, and it is subdivided into three degrees. The first is classified as *"Anxiety reactions, mild to moderate."* According to the authorities that degree does not absolve one from criminal liabilities, for persons who are so classified are found to be able to recognize right from wrong and to adhere to the right.

The second grouping is identified as *"Anxiety reactions, severe, without major personality disorganization."* Persons with that type of reaction are declared to be legally responsible, but they encounter more than normal difficulty in adhering to the right.

The third and last classification encompasses those human beings suffering from *"Anxiety reactions, severe, with major personality disorganization and clouding of consciousness."* Individuals falling in that category are not considered responsible for acts committed while in the acutely disorganized phase of such reactions. They are usually unadaptive, and compromise their safety. Typical of this is "panic run" during battle and this occurs usu-

ally during a shelling, but it is generally a temporary condition. However, in some cases the personality disorganization lasts longer and the individual remains disoriented, confused, and regressed over a period of days. Destruction or injury due to self-exposure to enemy fire is the fate of most of this grouping if they are not medically evacuated.

In measuring the accused's conduct and reactions, during the periods of enemy artillery activity and non-activity, by the medical testimony and psychiatric standards, we conclude he must be catalogued as being among those who suffer from severe anxiety reactions without major personality disorganization—the second degree of the combat-precipitated anxiety reactions listed above. According to both psychiatrists, his incapacity, if any, was chargeable to his mental condition and even though adherence to the right was more than normally difficult, he was considered able to adhere to the right, and legally responsible for his offense.

By asserting the defense of physical inability arising out of such symptoms as transient "freezing," shaking, tremors, marked perspiration, and urinary frequency, the petitioner is in effect saying that he was suffering largely from normal combat reaction, but nevertheless, that he was incapable of adhering to the right. However, measured by psychiatric standards the symptoms he displayed do not sustain his contention. His physical incapacity arose from his mental condition and to establish that defense he must show that he reached the stage of severe anxiety reactions with major personality disorganizations. If his disorder had sunk to that level, the psychiatrists would have testified that he could not distinguish right from wrong or could not adhere to the right. There was no evidence to that effect but the court-martial was nevertheless required to pass on that aspect of the problem. It was told by the law officer, in his instructions on insanity, that it must find on that issue and by its finding of guilt, it has determined the petitioner was responsible for his actions. Thus, it must be said that the defense of physical in-ability resulting from combat induced mental disorders is inextricably wound up with the defense of mental irresponsibility, and a submission of the latter issue is a submission of the former. Moreover, a finding that the accused can distinguish right from wrong and can adhere to the right is a finding that his mental and physical condition are such that he is responsible for his acts. Accordingly, when the court-martial considered the issue of mental responsibility, it, for the purposes of this case, also considered the defense of physical incapacity. We hold, therefore, that where physical inability resulting from a combat-precipitated psychiatric disorder is asserted as a defense, an instruction on insanity precludes the necessity of a law officer instructing sua sponte on physical incapacity. If defense counsel desires the subject matter treated in a more refined or detailed manner, he should furnish the law officer with a requested instruction.

The decision of the board of review is affirmed.

BROSMAN, Judge (concurring):
I concur with the author of the principal opinion.

It seems clear to me that—so far as the instructional question is concerned—this case was contested at the trial level solely on the theory that the accused was incapacitated from performing the required duty because of the presence of a temporary psychosomatic ailment. Since it was assumed that his physical symptoms had their etiology in the accused's mental state, the law officer correctly focused the court-martial's attention on that condition by means of accurate instructions on sanity.

This does not at all seem to be a Heims case—and I am sure that Judge Latimer is correct in suggesting that, where there is no claim that incapacity is based on a physical injury or deficiency, but instead entirely on combat exhaustion or the like, the only instruction demanded is one having to do with a mental disease, defect or derangement which might have served to deprive of ability to know right from wrong and adhere to the former. Cf.

**601**

United States v. Heims, 3 USCMA 418, 12 CMR 174. *However,* if the symptoms only had been the subject of testimony, and the evidence had not related them tightly to the accused's mental condition, then we might well face a different problem.

QUINN, Chief Judge (dissenting):

My disagreement with the majority's opinion is with regard to the instructions rather than on the question of sufficiency of the evidence. However, I must expressly dissent from its contention in connection with the latter to the effect that the accused "does not affirmatively assert he could not or did not hear" the order to report. The accused does not have to prove his innocence. On the contrary, the Government must affirmatively prove his guilt beyond a reasonable doubt. Conjecture or surmise cannot substitute for legal evidence. But, after a careful reading of the record, I am satisfied that there is sufficient evidence from which the court-martial could reasonably conclude that the accused heard and understood the order.

Turning to the law officer's instruc-

tions, I disagree with the majority's amalgamation of physical incapacity and mental responsibility. According to its own analysis of the diagnostic categories in combate psychiatry, an individual suffering from combat-induced "major personality disorganization" is not legally responsible for his acts, but he is quite capable of physical coordination and control. Thus, it is said that a typical reaction of a person in this group is "panic run." On the other hand, a person in the "anxiety reaction mild to moderate group" is regarded as legally sane. Yet, one of his reactions may be "transient freezing" which plainly implies complete loss of the ability to move physically. Consequently, an instruction on mental responsibility is not sufficient to inform a court-martial that physical incapacity, whatever its cause, is sufficient to constitute a defense to a charge of willful disobedience. Hence, I believe that this case is within the decision in United States v. Heims, 3 USCMA 418, 12 CMR 174, and in United States v. King, 5 USCMA 3, 17 CMR 3. I would, therefore, set aside the findings of guilty and order a rehearing.