UNITED STATES, Appellee

v.

William A. MEEKS, Staff Sergeant
U.S. Air Force, Appellant.

No. 93–0569.
CMR No. 29398.

U.S. Court of Military Appeals.

Argued March 15, 1994.

Decided Sept. 30, 1994.

For Appellant: *Captain J. Knight Champion, III* (argued); *Colonel Jay L. Cohen* and *Captain Robert A. Parks* (on brief); *Colonel Terry J. Woodhouse, Lieutenant Colonel Frank J. Spinner,* and *Captain Robert I. Smith.*

For Appellee: *Lieutenant Colonel Thomas E. Schlegel* (argued); *Colonel Jeffery T. Infelise* (on brief); *Major Jules D. Silberberg.*

## Opinion of the Court

CRAWFORD, Judge:

On January 22–25 and February 25, 1991,[1] appellant was convicted by a general court-martial of willfully disobeying an order of a superior commissioned officer to deploy to the Persian Gulf as part of Operation Desert Shield, in violation of Article 90, Uniform Code of Military Justice, 10 USC § 890. Appellant was sentenced by members to a dishonorable discharge, 2 years' confinement, and reduction to the lowest enlisted grade. The convening authority reduced the term of confinement from 2 years' to 1 year but otherwise approved the sentence. On September 16, 1991, the Air Force Clemency and Parole Board remitted the portion of the sentence in excess of a bad-conduct discharge, confinement for 1 year, and reduction to E1, and approved parole for appellant effective "as soon as possible." The court below affirmed the findings and the sentence. This Court granted review of Issues I, II, and III raised by appellate defense counsel; Issue IV raised by appellant pursuant to *United States v. Grostefon,* 12 MJ 431 (CMA 1982); and Issues V and VI which we specified as follows:

### I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE REFUSED TO INSTRUCT THE MEMBERS ON THE DEFENSE OF INABILITY.

### II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE INSTRUCTED THAT REASONABLE DOUBT MERELY REQUIRED PROOF TO A MORAL CERTAINTY RATHER THAN TO AN EVIDENTIARY CERTAINTY.

### III

WHETHER TRIAL COUNSEL'S ARGUMENT WAS SO INFLAMMATORY AND PREJUDICIAL THAT IT DEPRIVED APPELLANT OF A FAIR TRIAL.

### IV

WHETHER APPELLANT'S COMMANDER'S FAILURE TO ADVISE APPELLANT OF HIS ARTICLE 31 RIGHTS PRIOR TO INTERROGATION RENDERED HIS STATEMENTS OF OCTOBER 4–5, 1990, INADMISSIBLE.

### V

WHETHER TRIAL COUNSEL'S SENTENCING ARGUMENT UNFAIRLY PREJUDICED APPELLANT WHERE TRIAL COUNSEL ASKED THE COURT MEMBERS TO PUT THEMSELVES IN THE PLACE OF THOSE WHO DEPLOYED FOR SERVICE.

### VI

WHETHER TRIAL COUNSEL'S SENTENCING ARGUMENT UNFAIRLY PREJUDICED APPELLANT WHERE TRIAL COUNSEL REFERRED TO EVIDENCE NOT IN THE RECORD TO SUGGEST THAT APPELLANT COULD RECEIVE PSYCHIATRIC TREATMENT WHILE IN MILITARY CONFINEMENT.

---

1. We will take judicial notice that the Desert Storm air offensive began on January 16, 1991, and the ground offensive was waged from February 24–27, 1991.

We hold that, under the facts of this case, where lack of mental responsibility is asserted as a defense to disobedience of an order and the defense of physical inability is inextricably tied to the defense of lack of mental responsibility, an instruction on lack of mental responsibility precludes the necessity of an instruction on physical inability; the instruction on reasonable doubt was not erroneous; trial counsel's arguments did not ask court members to set aside their impartiality; appellant's statements "I can't" on October 4–5, 1990, were admissible; and trial counsel did not improperly argue concerning psychiatric treatment in a military confinement facility.

## DEFENSE OF INABILITY

### FACTS

Appellant was a security policeman assigned to Brooks Air Force Base, Texas. Appellant was named to a 13–member "deployment team" organized to conduct air base ground defense. On October 3, 1990, appellant's team was ordered to deploy to the Persian Gulf as part of Operation Desert Shield.

At 1600 hours on October 3, 1990, appellant visited the head chaplain and was upset about his possible deployment. The next day appellant sought treatment at an outpatient mental health clinic and was referred to the emergency room of Wilford Hall Medical Center for a mental status evaluation due to possible depression. Appellant was diagnosed as dehydrated and given intravenous fluids and was also diagnosed as "mildly anxious and depressed" but deployable. Appellant admitted that he had not sought medical care prior to being notified about the deployment. On October 5, 1990, appellant saw a flight surgeon as a followup to his Wilford Hall visit. At this appointment appellant was no longer dehydrated and was determined to be medically fit for duty. This determination was made without benefit of appellant's mental health evaluations. Appellant then reported to the office of Captain Andersen, his commander, who gave him the following order, "Staff Sergeant Meeks, I am ordering you to report to CBPO [Consolidated Base Personnel Office] for processing to deploy with your team.... Will you do that?" Appellant replied, "I can't," and was immediately relieved of duty. He did not deploy with his team the following day.

The charge against appellant was preferred on October 19, 1990. Appellant was referred by the base commander for a Sanity Board in conjunction with the charges pending against him. The Sanity Board commenced on December 3, 1990, and "concluded that at the time of the ... offense" appellant "was suffering from an adjustment disorder with mixed emotional features ... of depression and ... profound anxiety" rendering him unable to obey the order to deploy. The Board determined that the disorder was brought about by the following combination of stress factors: appellant's child having been diagnosed with infantile rheumatoid arthritis early in 1990, a note from the IRS in April 1990, his father-in-law having been diagnosed with terminal cancer early the same year, and appellant's order to deploy. As a result of the anxiety, appellant was experiencing physical symptoms including headaches, gastro-intestinal distress, and sleeplessness.

The Government offered rebuttal testimony of a forensic psychiatrist which refuted the Sanity Board's findings.

Appellant's trial strategy beginning with *voir dire* was to prove that appellant was unable to obey the order to deploy because he was suffering from anxiety and depression.

### DISCUSSION

■■■ Inability is a defense to disobedience to orders if the accused's condition made it impossible to obey the order. *United States v. Williams*, 21 MJ 360, 362 (CMA 1986). The judge has a *sua sponte* duty to instruct on this affirmative defense when fairly raised by the evidence, even without a specific request by the defense. *United States v. Cooley*, 16 USCMA 24, 36 CMR 180 (1966); *United States v. Heims*, 3 USCMA 418, 12 CMR 174 (1953).

Appellant asserts that evidence that he suffered both physical and mental illness entitled him to instructions on both physical inability and lack of mental responsibility. Appellant argues that it was prejudicial error not to give the instruction on physical inability since the amount of evidence required for instructions on affirmative defenses does not need to "be compelling or convincing beyond a reasonable doubt." *United States v. Van Syoc*, 36 MJ 461, 464 (CMA 1993) (citation omitted).

■ At the outset we note that the defense of physical inability, although not always susceptible of precise definition, *United States v. Heims, supra*, has been explained as being

> a matter of degree, and it will not justify the acts of the accused in refusing to comply with the order unless such refusal was reasonable in the light of the fact and extent of the ailment, its relation to the task imposed or other subject matter of the order, the pressing nature of the circumstances involved, and any other relevant circumstances.

*United States v. Tolle*, 39 CMR 297–99 (ABR 1968). Further, the physical condition must be the proximate cause of the offense. *Id.* at 299.

■ The question at issue here, however, is how to treat evidence of physical inability, also an affirmative defense to disobedience to orders, which is inextricably tied to a defense of lack of mental responsibility. The court below determined:

> An inability instruction based on appellant's mental condition would have duplicated the instruction the military judge properly gave on partial lack of mental responsibility. In these circumstances, any inability instruction would have been more likely to confuse the members than to assist them.

Unpub. op. at 6.

The determination by the court below is supported by this Court's decision in *United States v. Latsis*, 5 USCMA 596, 18 CMR 220 (1955). We held in *Latsis* that

> where physical inability resulting from a combat-precipitated psychiatric disorder is asserted as a defense, an instruction on insanity precludes the necessity of a law officer instructing sua sponte on physical incapacity....

5 USCMA at 601, 18 CMR at 225. The rationale for this holding was "that the defense of physical inability resulting from combat induced mental disorders is inextricably wound up with the defense of mental irresponsibility, and a submission of the latter issue is a submission of the former" and that "when the court-martial considered the issue of mental responsibility, it ... also considered the defense of physical incapacity." *Id.*

There are some obvious differences between the facts of this case and those in *Latsis*. Concerning the question of appellant's mental capacity, expert witnesses testified for both sides and obviously "held contradictory conclusions derived from essentially the same facts." Unpub. op. at 3. Further, "[a]ll the mental health experts agreed appellant had no psychosis or other serious mental illness, and there was no issue of a lack of mental responsibility within the meaning of RCM 916(k)[, Manual for Courts–Martial, United States, 1984] or a lack of mental capacity to stand trial under RCM 909." Unpub. op. at 4. Hence, an instruction was given on partial lack of mental responsibility. Additionally, appellant's problems were not combat induced but perhaps best described as stress related.

Nonetheless, under the facts of this case, where appellant's physical symptoms are insignificant as compared to his mental distress and are part and parcel of his mental distress, we believe the same rationale applies. Here, the mental inability rather than the physical inability is asserted to be the proximate cause of the disobedience; we distinguish those cases where physical inability is asserted to be the proximate cause of the inability.

If appellant cannot move because his leg is broken, that is physical inability. If he cannot adhere to the right (move) because of a mental disease or defect, that is the lack of

mental responsibility. The burden in the former is on the Government, RCM 916(b), and in the latter on the defense, Art. 50a, UCMJ, 10 USC § 850a. A shift in the burden of proof does not change the fact that appellant cannot move. Of course, incapacity or inability to some extent is a matter of degree, but not in this case.

Accordingly, we hold that, under the facts of this case, where lack of mental responsibility is asserted as a defense to disobedience of an order and the defense of physical inability is inextricably tied to the defense of lack of mental responsibility, an instruction on lack of mental responsibility precludes the necessity for an instruction on physical inability. *United States v. Latsis, supra.*

## REASONABLE–DOUBT INSTRUCTIONS

### FACTS

■ Appellant also argues that the military judge improperly instructed the members on the definition of reasonable doubt. *See Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). Judge Breidenbach gave the following reasonable-doubt instruction:

Reasonable doubt is not a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or the lack of it in a case. It is an honest misgiving caused by insufficiency of proof of guilt. Proof beyond a reasonable doubt means proof to *a moral certainty,* although not necessarily an absolute or mathematical certainty. A reasonable doubt is a doubt which would cause a reasonably prudent person to *hesitate to act* in important and weighty personal affairs. The proof must be such as to exclude *not every hypothesis* or possibility of innocence, but every fair and rational hypothesis except that of guilt. The rule as to reasonable doubt extends to every element of the offense, although each particular fact advanced by the prosecution which does not amount to an element, need not be established beyond a reasonable doubt. However, if, on the whole evidence,

you are satisfied beyond a reasonable doubt of the truth of each and every element, then you should find the accused guilty.

Certificate of Correction (March 9, 1994) (emphasis added). Both counsel expressly waived any objection to this instruction.

### DISCUSSION

The above instruction should be contrasted with the following instruction in *Cage v. Louisiana, supra:*

[A] reasonable doubt ... is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but *a moral certainty.*

498 U.S. at 40, 111 S.Ct. at 329.

The Supreme Court in *Cage* zeroed in on three phrases: "actual substantial doubt," "grave uncertainty," and "moral certainty." Only the third phrase, "moral certainty," appears in the instruction given in this case. The *Cage* Court then noted:

The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty.

The Court continued by stating "that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." It is when these two "statements" are

considered with the reference to "moral certainty," rather than evidentiary certainty, [that] it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based

on a degree of proof below that required by the Due Process Clause.

*Cage v. Louisiana,* 498 U.S. at 41, 111 S.Ct. at 329.

In *United States v. Robinson,* 38 MJ 30 (CMA 1993), we held that an instruction similar to that given here was not plain error because the error was not obvious and did not affect a substantial right of the accused. In *Sullivan v. Louisiana,* —— U.S. ——, ————, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the Supreme Court held that a violation of *Cage* could not be harmless error because it constitutes such fundamental error that it must result in a reversal of the defendant's conviction regardless of the strength of the evidence against him.

Recently, in *Victor v. Nebraska* and *Sandoval v. California,* —— U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the Court addressed references to moral certainty.

The instruction in *Victor* was as follows: "Reasonable doubt" is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, *to a moral certainty,* of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the *strong probabilities of the case,* provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an *actual and substantial doubt* arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the state, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

—— U.S. at ——, 114 S.Ct. at 1249.

The instruction in *Sandoval* was as follows:

A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt.

Reasonable doubt is defined as follows: It is *not a mere possible doubt;* because everything relating to human affairs, and *depending on moral evidence,* is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, *to a moral certainty,* of the truth of the charge.

*Id.* at ——, 114 S.Ct. at 1244.

The Court remanded the following instruction from *North Carolina v. Bryant,* —— U.S. ——, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994) (instructions set out in 337 N.C. 298, 446 S.E.2d 71, 73 (1994)), for consideration in light of *Victor:*

When it is said that the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, it is meant that they must be fully satisfied or entirely convinced or satisfied to *a moral certainty* of the truth of the charge.

If, after considering, comparing and weighing all the evidence, the minds of the jurors are left in such condition that they cannot say they have an abiding faith to *a moral certainty* in the defendant's guilt, then they have a reasonable doubt; otherwise not.

A reasonable doubt, as that term is employed in the administration of criminal law, is *an honest substantial misgiving* generated by the insufficiency of the proof. . . .

On remand this instruction was held valid by the Supreme Court of North Carolina, which stated:

We next consider defendant's argument that the use of the phrase "moral certainty" in this instruction would allow a jury to

return a verdict of guilty based on a subjective feeling rather than upon an evaluation of the evidence. The Court in *Victor* acknowledged the distinction drawn in *Cage* between "moral certainty" and "evidentiary certainty." *Victor*, 511 U.S. at ——, 114 S.Ct. at 1248, 127 L.Ed.2d at 596. The Court stated, however, that in *Cage*, "the jurors were simply told that they had to be morally certain of the defendant's guilt; there was nothing else in the instruction to lend meaning to the phrase." *Id.* In *Victor*, the jury was explicitly told to base its conclusion on the evidence in the case, and there were other instructions which reinforced this message.

Likewise, in the present case, the jury was instructed that a reasonable doubt existed "if, after considering, comparing and weighing all the evidence, the minds of the jurors are left in such condition that they cannot say they have an abiding faith to a moral certainty in the defendant's guilt." The jury was also instructed that a reasonable doubt is "a sane, rational doubt arising out of the evidence or lack of evidence or from its deficiency" and that it is "an honest substantial misgiving generated by the insufficiency of the proof." We therefore conclude that, under *Victor*, "there is no reasonable likelihood that the jury would have understood moral certainty to be disassociated from the evidence in the case."

*State v. Bryant*, 337 N.C. 298, 446 S.E.2d 71, 76 (1994).

In *Sandoval* the Court rejected the argument that the phrase "moral certainty" would allow a conviction on less than "a reasonable-doubt standard." This is because "the judge had already informed the jury that matters relating to human affairs are proved by moral evidence; giving the same meaning to the word moral in this part of the

instruction, moral certainty can only mean certainty with respect to human affairs." —— U.S. at ——, 114 S.Ct. at 1247 (citation omitted). Thus, the Court found there was no error here in using the term "moral certainty, in conjunction with the abiding conviction language ["Reasonable doubt ... leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the change." —— U.S. at ——, 114 S.Ct. at 1244.]" —— U.S. at ——, 114 S.Ct. at 1247. The Court distinguished *Cage* on the basis that "there was nothing else in the instruction to lend meaning to the phrase [moral certainty]." While finding no violation of due process the Court refused to "condone the use of the phrase." —— U.S. at ——, 114 S.Ct. at 1248.

As to the instruction in *Victor*, the Court indicated:

Instructing the jurors that they must have an abiding conviction of the defendant's guilt does much to alleviate any concerns that the phrase moral certainty might be misunderstood in the abstract. The instruction also equated a doubt sufficient to preclude moral certainty with a doubt that would cause a reasonable person to hesitate to act. In other words, a juror morally certain of a fact would not hesitate to rely on it; and such a fact can fairly be said to have been proven beyond a reasonable doubt.

—— U.S. at ——— ———, 114 S.Ct. at 1250–51 (citation omitted).

When the instruction in this case is contrasted with the instructions in *Sandoval*, *Victor* and *Bryant*, we are confident there is no chance of the court members' being confused as to their responsibilities. Thus, we conclude that there was no error here.[2]

**2.** However, the Armed Forces should reexamine their reasonable-doubt instruction. One possibility is the one recommended by the Federal Judicial Center that reads as follows:

[T]he government has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more

likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require

## ARGUMENT—PARTIALITY

### FACTS

■ During his closing statement on sentencing, trial counsel argued:

As for five years' confinement, please realize that while he's in confinement, he's going to be here in America safe. His wife and kid can come visit him every Sunday. That is so important. Please understand what he will be facing in confinement and what he won't be facing had he deployed last October. Compared to what this man has gotten out of, the fear he would have had last October had he deployed, five years in jail is nothing compared to the fear that he had last October. Please also, and this is so important, think about his co-workers that did deploy last October. Think of the message that you're going to send to them. Think about Sergeant Bradford, who had to volunteer to replace this man ... [sic] who went voluntarily, if he finds out that this man got a light sentence, think of the message that you're going to send out—

DC: Objection, Your Honor. There's no evidence to—

MJ: Overruled. Go ahead.

TC: I just want you to think about his co-workers who did deploy last October ... [sic] the message that you're going to send to them. You all have a very tough decision here today....

Based on this argument the defense argues that trial counsel is asking the court members to put themselves in the place of those who have deployed. Appellant recognizes that it would have been proper to argue about manning problems or morale problems in the unit. However, appellant argues that it was unduly prejudicial to ask the court members to put themselves in the shoes of those who were already serving in the Gulf.

proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

## DISCUSSION

■ As we said in *United States v. Kropf,* 39 MJ 107, 108 (1994):

Trial counsel is required to represent zealously the Government and offer vigorous arguments for sentencing. Rule 1.3 (Comment), ABA Model Rules of Professional Conduct (1989 ed.); *United States v. Edwards,* 35 MJ 351 (CMA 1992). Arguments must be based on a fair reading of the record. *United States v. White,* 36 MJ 306 (CMA 1993); *United States v. Nelson,* 1 MJ 235 (CMA 1975). Counsel may comment on contemporary history or matters of common knowledge within the community. *United States v. Long,* 17 USCMA 323, 38 CMR 121 (1967). But [*see*] RCM 1001(g)....

However, we have held that it is inappropriate for trial counsel to urge the court members to consider the victim as their child, *United States v. Wood,* 18 USCMA 291, 296, 40 CMR 3, 8 (1969), or to suggest that they consider themselves as the helpless husband who witnesses the gang rape of his wife, *United States v. Shamberger,* 1 MJ 377, 379 (CMA 1976). But counsel may comment on "matters of common knowledge within the community." *United States v. Kropf, supra* at 108. *See also* Standard 3–5.9, ABA Standards for Criminal Justice: The Prosecution Function at 3.91 (2d ed, 1986), which states that the prosecutor may argue "matters of common public knowledge based on ordinary human experience...." *See* 50 Cr.L.2067–Standard approved (Feb. 3, 1992). In this instance appellant's trial started after the air war and his sentencing was taking place at the same time that the United States and its allies were engaged in the ground war. These facts were most certainly "matters of common public knowledge within" both civilian

Federal Judicial Center, Pattern Criminal Jury Instructions 17–18 (1987) (instruction 21), *quoted* from *Victor v. Nebraska,* —— U.S. ——, 114 S.Ct. 1239, 1253, 127 L.Ed.2d 583 (1994) (Ginsburg, J., concurring in part and concurring in the judgment).

and military communities. Trial counsel's argument was a fair comment on preserving good order and discipline and the needs of general deterrence.

## ARGUMENT–PSYCHIATRIC TREATMENT

### FACTS

■ Appellant's psychiatrist, Captain John W. Thompson, Jr., from Wilford Hall testified both at findings and sentencing. During direct examination at sentencing, defense counsel elicited testimony from Captain Thompson that appellant required continued mental health treatment. The implication of this testimony was that appellant should not be sentenced to confinement.

During cross-examination by assistant trial counsel, the following exchange occurred:

Q: And if the accused were confined isn't it true that he can still get treatment for any mental health problems that may exist at that time?

A: I'd have to specifically—

DC: Your Honor, that's an ambiguous question and we're going to have to object.

MJ: Overruled. Go ahead.

WIT: Okay. I guess you'd have to look at what the level of quality of care would be. I've worked in one prison and a couple of jail populations, and I can tell you that with him, personal psychotherapy would be a rare occurrence if someone was getting weekly, hour-long individual psychotherapy in that population. If that occurs, and he could get that kind of treatment, whether that would be from a psychiatrist who is also treating him, I don't know. It would depend upon the specific prison population on whether or not he could get that kind of treatment there.

ATC: And, the prison systems that you've worked in are civilian, isn't that correct? I'm trying to remember from the findings portion when you testified.

A: In Florida ... [sic] with the State Prison system in Florida in the county in Florida as well, Alachua County, and then with my own experience with the Texas system, Texas Department of Corrections, when I went to medical school, and we did evaluations on the psychiatric patients there, and those were ones that were referred from various areas in Texas to be evaluated, so I have experience in those areas.

Q: And you're not familiar with the military confinement?

A: Not familiar exactly what his treatment would be in a prison military system.

Q: Captain Thompson, one more question. Just a little bit more specifically, do you know whether or not Lowry or Leavenworth specifically those confinement facilities have a means of treating the accused?

A: The last that I heard about Leavenworth was from the forensic psychiatrist there and that was about a year ago. And his description of it to me was that ... [sic] now he saw the patients very briefly for medication adjustments, and there were a lot more people to see then he had time to see. So, that's all I know about the Leavenworth system. I'm not familiar with the other systems.

After redirect examination, First Lieutenant Thomas, a court member, asked the following question:

Q: Captain Thompson, you may have already addressed this. Could Sergeant Meeks receive treatment on a confinement basis similar to what he is receiving at Wilford Hall?

A: I'd have to answer that based on the limited knowledge that I've spoken about before. My opinion is that he wouldn't receive the same care that he would at Wilford Hall. In that we're a highly staffed unit and we have all kinds of different therapies available to patients. Prisons are not going to have all those facilities as near as I know. We are able to care for him better. That's all I can tell you. I think that's commonly held throughout the United States. The judicial system is starting to address some of those issues that that standard of care is not as high in those areas as it is on our ward. I hope that helps you.

Based on this evidence trial counsel argued that psychiatric treatment was available while in confinement:

> Captain Ruiz [defense counsel] mentioned that you should not sentence this man to prison or discharge him because he's sick. Well, again, he can go to confinement, and even Doctor Thompson can testify that there were treatment facilities at various confinement facilities....

The defense cites *United States v. Stevenson*, 34 CMR 655, 659–60 (ABR), *pet. denied*, 15 USCMA 670 (1964), for the proposition that an argument concerning psychiatric care in a military correctional facility is improper. "[T]he trial counsel had no evidentiary basis whatever for his assertion of the adequacy of the facilities of the Army correctional and penal system for dealing with the accused's psychiatric problem." 34 CMR at 660.

Under the circumstances of this case the argument by trial counsel was not error. Captain Thompson did testify that mental health treatment was available at both the civilian and military confinement facilities. Although he had limited knowledge regarding the psychiatric treatment available at Fort Leavenworth, he felt knowledgeable enough to testify that appellant would not receive the appropriate care while in confinement. Contrary to the defense assertion that the prosecutor's argument concerning Captain Thompson's testimony was improper because it concerned psychiatric treatment in a military confinement facility, such argument was not improper because it was based on matters excluded by the military judge. *Cf. United States v. Causey*, 37 MJ 308 (CMA 1993); *United States v. White*, 36 MJ 306 (CMA 1993).

## ARTICLE 31

### FACTS

Appellant's commander, Captain Andersen, talked to appellant on several occasions prior to relieving him of duty on October 5, 1990, for not deploying. On October 4, 1990, the commander was not sure "what the problem was with" appellant. "Everybody that I had talked to up to this point felt that he was going to be able to deploy with the team...." The military judge found:

> Captain Anderson did not suspect the accused of committing any offense at this time [at the Primary Care Clinic]. He did not know the circumstances of the missed mobility meeting and the failure to remain on standby. He did not know if the accused had been notified and he thought there might be a legitimate reason for seeking medical attention.

Captain Andersen enlisted the aid of appellant's wife to convince appellant to deploy. He then visited with appellant for 3 1/2 hours at the hospital and "towards the end of the 3–and–a–half hours, ... realized that there was a good possibility he may choose not to deploy." At this meeting

> [t]he accused told him that he did not feel he had shown the proper love and affection for his wife and family. He felt that if he were deployed and he were killed he would never have the opportunity to make up for the lack of attention. He continually responded that he couldn't deploy.

Captain Andersen then told him he would meet with him later, but he should "think about the situation." On October 5, 1990, he called appellant into his office and gave him this order: "Sergeant Meeks, I am ordering you to report to the CBO for processing for deployment to deploy with your team. Will you do that?" Appellant responded, "I can't."

## DISCUSSION

Article 31(b), UCMJ, 10 USC § 831(b), provides:

> No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

*See also* Mil.R.Evid. 305(c), Manual, *supra.* Both Article 31(b) and Mil.R.Evid. 305(c) provide that a person subject to the Code must give warnings under Article 31 before "interrogat[ing], or request[ing] any statement from an accused or a person suspected of an offense."

### Standard of Review

 As we stated in *United States v. Davis*, 36 MJ 337, 340 (CMA 1993), *aff'd on other grounds,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the standard of review is as follows:

Whether a person being interviewed is a "suspect" is a question of law. *United States v. Good,* 32 MJ 105, 108 (CMA 1991). The military judge's factual determinations pertaining to what criminal investigators knew at the time of the interview will be upheld unless "clearly erroneous"; but the legal issue whether the person being interviewed was a suspect will be reviewed *de novo. Id.; United States v. Uribe–Velasco,* 930 F.2d 1029, 1032 (2d Cir.1991). If a criminal "investigator suspects or reasonably should suspect" a person "of a crime, then rights' warnings are required." *United States v. Schake,* 30 MJ 314, 317 (CMA 1990).

### Who Must be Warned

 It is clear that an accused is a person who has had charges preferred against him. The question in this case is whether appellant was a "suspect" when Captain Anderson ordered him to deploy. The fact that there is "a hunch" that a crime has been committed does not trigger Article 31(b). The test to be applied is an objective test asking whether a reasonable person should consider appellant to be a suspect under the totality of the circumstances. *United States v. Leiffer,* 13 MJ 337, 343 (CMA 1982).[3]

In *United States v. Shepard,* 38 MJ 408 (CMA 1993), appellant was late for the unit formation. When he approached his squad leader, he told him:

"You need to call the MPs [military police]." When the squad leader asked why, the appellant said, "You don't know yet. You'll find out. I just need the MPs."

Later the platoon sergeant invited appellant into his office to discuss missing formation. At that time "appellant blurted out that he needed to go to jail." 38 MJ at 409. We held that the platoon sergeant "did not suspect or have any reason to suspect that appellant had just murdered his wife. His purpose in questioning appellant was to determine the reason for his absence at formation and assess the general welfare of his family." 38 MJ at 411.

Also, in *United States v. Davis, supra,* we held appellant was not a suspect. The investigators "had determined that a pool cue was the probable murder weapon," but they had not determined how many individuals "owned pool cues." Appellant's interview was the second or third of an individual known to have owned a pool cue. Although appellant had "intimate information" concerning the crime, this "was attributed to third parties." Even though appellant was known as a "disciplinary problem" and had made "bizarre comments about killing someone," 36 MJ at

---

**3.** Since the earlier opinions of this Court, there has been guidance from the Supreme Court that an objective standard should be applied in many areas, *e.g.,* what constitutes probable cause, *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1722–23, 56 L.Ed.2d 168 (1978); what constitutes custody, *Stansbury v. California,* —— U.S. ——, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); and what constitutes an interrogation, *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Court, in applying an objective standard in *Innis,* declared:

This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

*Id.* at 301–02 n. 7, 100 S.Ct. at 1690 n. 7.

Lastly, neither Article 31, Uniform Code of Military Justice, 10 USC § 831, nor *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was meant to apply to a future offense.

340–41, we held that he was not a suspect within the meaning of Article 31. 36 MJ at 341.

Likewise, in this case, we agree with the military judge that appellant was not a suspect. The commander did not know if appellant had failed to repair. In any event, he thought there might be a legitimate reason for missing the formation.

Captain Andersen was trying to determine whether Sergeant Meeks would deploy. Until appellant replied, "I can't," to the order, he had not committed any offense. While a commander may suspect that a servicemember will not obey an order, most commanders hope, based on their personal presence and the power of their office, that the person will obey when eventually confronted with the order. Commanders are not required to anticipate disobedience of orders and to give an Article 31 warning before an order is given. There is no requirement to prospectively advise an individual of Article 31 rights prior to commission of an offense.

### When Warning Must be Given

 A warning under Article 31 must be given when the interrogator is "interrogat[ing], or request[ing] any statement." Relying on *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), Mil. R.Evid. 305(b)(2) defines "interrogation" to include "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning." As we have "long intimated," Article 31 "requires warnings only when questioning is done during an official law-enforcement investigation or disciplinary inquiry." *United States v. Loukas*, 29 MJ 385, 387 (CMA 1990); *United States v. Duga*, 10 MJ 206 (CMA 1981). Like the admission of appellant in *United States v. Shepard*, 38 MJ 408, 411 (CMA 1993), the counseling by Captain Andersen was not "an interrogation or a request for a statement within the meaning of Article 31." The purpose of counseling appellant was to advise him of the consequences of not deploying. *Id.* Thus, the statements made by appellant without warnings were not barred by Article 31. *Id.* and cases cited therein.

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX and GIERKE concur.

SULLIVAN, Chief Judge (concurring in the result):

I agree with the majority opinion's conclusion that the instruction on physical inability was not required in this case. However, I am unable to base my conclusion on this Court's out-dated opinion in *United States v. Latsis*, 5 USCMA 596, 18 CMR 220 (1955). *Latsis* was decided at a time when the Government was required to prove the accused's mental responsibility beyond a reasonable doubt. Today, however, the accused must demonstrate "by clear and convincing evidence" that he is not mentally responsible. *United States v. Lilly*, 25 MJ 403, 406 n. 4 (CMA 1988); Art. 50a, Uniform Code of Military Justice, 10 USC § 850a; *see also United States v. Massey*, 27 MJ 371 372–73 (CMA 1989). In any event, no instruction on the defense of lack of mental responsibility was given in this case.

Physical inability is an affirmative defense, RCM 916(i), Manual for Courts–Martial, United States, 1984, which shifts the burden to the Government to prove beyond a reasonable doubt that the inability did not exist. RCM 916(b). Therefore, subsuming the defense of physical inability into the defense of lack of mental responsibility operates to impermissibly shift the burden of proof on this defense to the accused. *See* Art. 36(a), UCMJ, 10 USC § 836(a). This I cannot join. Instead, I find no evidence of physical inability in this record and conclude that such an instruction was not required. *Cf. United States v. McMonagle*, 38 MJ 53 (CMA 1993); *United States v. Van Syoc*, 36 MJ 461 (CMA 1993).

On the fourth issue in this case, I again agree only in the result. Article 31(b), UCMJ, 10 USC § 831(b), states:

(b) No person subject to this chapter may interrogate, or request any statement from, an accused or *a person suspected of an offense* without first informing him of the nature of the accusation and advising

him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

(Emphasis added.) Congress plainly did not limit this advice requirement to those persons who "a reasonable person should" suspect. 41 MJ at 161. Moreover, our case law has repeatedly held that "[i]f a criminal investigator suspects *or* reasonably should suspect a person of a crime, then rights and warnings are required." *United States v. Davis*, 36 MJ 337, 340 (CMA 1993), *aff'd on other grounds*, —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *United States v. Shake*, 30 MJ 314, 317 (CMA 1990); *United States v. Lee*, 25 MJ 457, 461 (CMA 1988); *United States v. Morris*, 13 MJ 297, 298 (CMA 1982); *United States v. Henry*, 21 USCMA 98, 101, 44 CMR 152, 155 (1971); *United States v. Anglin*, 18 USCMA 520, 523–24, 40 CMR 232, 235–36 (1969).

Dicta in the majority opinion narrows the above rule by suggesting that only the objective test should be utilized in determining whether a person is a suspect for purposes of Article 31(b). *Contra United States v. Hilton*, 32 MJ 393, 396 (CMA 1991) ("a subjective belief [by the questioner] is sufficient for purposes of Article 31, regardless of its basis"). Our case law, however, has sanctioned such an inquiry only where the questioner denies actually suspecting a questioned person. *See United States v. Leiffer*, 13 MJ 337, 343 (CMA 1982); *United States v. Graham*, 21 USCMA 489, 491, 45 CMR 263, 265

(1972); *United States v. Schafer*, 13 USCMA 83, 88, 32 CMR 83, 88 (1962); *United States v. Doyle*, 9 USCMA 302, 310, 26 CMR 82, 90 (1958); *United States v. Hopkins*, 7 USCMA 519, 522, 22 CMR 309, 312 (1957). In other words, the focus of inquiry under Article 31(b) is always the actual state of mind of the questioner; however, testimonial denials by the questioner are not conclusive on this factual question. This is not an objective test. *Cf. Stansbury v. California*, —— U.S. ——, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) ("determination of custody" for purposes of warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), "depends on the objective circumstances of the interrogation"; the uncommunicated "subjective views" of the interrogator are irrelevant); *but see* H. Moyer, *Justice and the Military* § 2–213 at 334 (1972).

Turning to the present case, I note that its resolution does not even require a conclusion concerning the subjective or objective nature of our test to determine a suspect under Article 31(b). A "hunch" is generally defined as "a strong intuitive feeling concerning a *future* event or result." *Webster's Ninth New Collegiate Dictionary* 587 (1991) (emphasis added).[1] Captain Anderson denied that he suspected appellant of any crime already committed and asserted only a belief that appellant might not deploy in the future. I would simply hold that Article 31(b) is limited to suspicions of *offenses already committed* and does not apply to hunches. *See also United States v. Davis*, 8 USCMA 196, 198, 24 CMR 6, 8 (1957).[2]

1. The majority's use of this term with respect to "a crime [that] has been committed," 41 MJ at 160, is, at best, imprecise. In any event the record of trial unequivocally established that the hunch in question concerned a crime that had not yet been committed.

2. The following colloquy occurred during the hearings on the proposed Uniform Code of Military Justice:

Mr. Brooks. Mr. Larkin, if you are going to start revising, subsection (b) says "An accused or a person suspected of an offense." Now, what does that mean?

Mr. Larkin. Well, that is——

Mr. Brooks. How would a person know he was suspected of an offense?

Mr. Larkin. Well, *after an offense has been committed* a number of persons who are suspected might be brought in for questioning none of whom have been accused because the evidence is not complete enough to indicate who the perpetrator may be.

Mr. Brooks. But you can't interrogate him without first informing him of the nature of the accusation.

Mr. Larkin. That is right. You would have to tell him that the crime of larceny has been committed, for instance. You could say that this is an inquiry in connection with it and that

Accordingly, I would affirm the decision below on this basis alone.

WISS, Judge (concurring in part and dissenting in part):

I fully agree with the majority opinion except as to Issue I and Issue IV. As to the latter, I agree except insofar as the majority purports to limit the long-standing test in this Court for when an accused is a "suspect" for purposes of Article 31(b), Uniform Code of Military Justice, 10 USC § 831(b). I will address these two areas of disagreement in reverse order.

## WHO IS A SUSPECT?

"The test to determine if a person is a suspect is whether, considering all facts and circumstances at the time of the interview, the government interrogator *believed or reasonably should have believed* that the one interrogated committed an offense." *United States v. Morris*, 13 MJ 297, 298 (CMA 1982) (footnote omitted; emphasis added), *citing United States v. Anglin*, 18 USCMA 520, 523–24, 40 CMR 232, 235–36 (1969). *See United States v. Kendig*, 36 MJ 291, 294 (CMA 1993); *United States v. Ravenel*, 26 MJ 344, 346 (CMA 1988). *Accord United States v. Davis*, 36 MJ 337, 340, 129 L.Ed.2d 362 (CMA 1993), *aff'd on other grounds*, —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *United States v. Schake*, 30 MJ 314, 317 (CMA 1990).

The majority acknowledges this test while quoting from *Davis*, 41 MJ at 161, but then it inexplicably edits out from it the first half of what the emphasized language above would seem clearly to reflect to be *alternative* subjective and objective tests. Judge Crawford writes: "The test to be applied is *an objective test* asking whether a reasonable person should consider appellant to be a suspect under the totality of the circumstances. *United States v. Leiffer*, 13 MJ 337, 343 (CMA 1982)." 41 MJ at 161 (emphasis added). *Leiffer* did in fact "apply an objective standard to this situation," 13 MJ at 343, but it did so only *after* pointing out that the interrogator had steadfastly maintained that he had not "consider[ed] the accused a 'suspect' "—that is, only after first focusing on and eliminating the *subjective* alternative for finding that the accused had been a suspect entitled to his rights' advisement.

This might appear to be an inadvertent stumble by the majority, rather than reflective of an intent substantively to modify the test followed by this Court for decades, except for the majority's footnote 3. That footnote, however, is unsatisfactory by way of explaining the majority's marked departure from our precedent (even though, under the circumstances of this case, it is gratuitous dicta). It offers no analysis at all, and none of the "many areas" that the majority indicates has been addressed by the Supreme Court involves the question of what constitutes a suspect. In light of the discussion in Chief Judge Sullivan's separate opinion, this matter deserves full plenary consideration by this Court, not mere naked pronouncement.

you intend to ask him questions about it, but that he should be informed that he does not have to make any statement about it.

All that does is broaden the protection of self-incrimination so that whether a person is actually the accused and you attempt to interrogate him or whether you just don't know who the accused is and there are five or six people whom you suspect they are all protected.

Mr. Brooks. Why have it in the nature of an accusation, though, unless there is an accusation?

Mr. DeGraffenried. As I understand it, Mr. Larkin, is this what you have on your mind:

*Say a crime is committed and* several people are suspected but no one has been arrested.

Mr. Larkin. Yes.

 \* \* \*

Mr. DeGraffenried. You ask them to come in and you inform *them of the crime that has been committed.*

Mr. Larkin. Yes, sir.

Mr. DeGraffenried. Say that somebody has been shot or something of that kind.

Mr. Larkin. Yes.

Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 990, *reprinted in Index and Legislative History, Uniform Code of Military Justice (1950)* (emphasis added).

## DEFENSE OF INABILITY

### A. Was it raised?

The majority opinion points out:

The sanity board commenced on December 3, 1990, and "concluded that at the time of the ... offense" appellant "was suffering from an *adjustment disorder with mixed emotional features ... of depression and ... profound anxiety*" rendering him *unable to obey the order to deploy*. The board determined that the disorder was brought about by the following combination of stress factors: appellant's child having been diagnosed with [paralyzing] infantile rheumatoid arthritis early in 1990, a note from the IRS in April 1990, his father-in-law having been diagnosed with terminal cancer early the same year, and appellant's order to deploy. . . .

41 MJ at 153.

In sum and substance, that is the basis of appellant's claim in this Court that the military judge erred by not instructing *sua sponte* on the affirmative defense of inability. To be clear, that defense is articulated in RCM 916(i), Manual for Courts–Martial, United States, 1984, as follows: "It is a defense to refusal or failure to perform a duty that the accused was, through no fault of the accused, *not physically or financially able to perform the duty*." (Emphasis added.) *See United States v. Williams,* 21 MJ 360, 362 (CMA 1986). The sanity board's report raises two apparent possibilities which should be measured against the defined perimeter of this defense.

First, the board's conclusion might be inferred to suggest that appellant's adjustment disorder mixed with depression and profound anxiety "render[ed] him unable" in a *physical* sense "to obey the order to deploy." Under this construction, it might be expected that the more pressure appellant felt to deploy under his circumstances and the closer the point of deployment became, the more he *physically* would respond with rigidity—not unlike a phobic person responding in escalating degree the closer he comes to encountering the object of his phobia, until ultimately the point of physical paralysis or breakdown arrives.

Second, the board's conclusion might be inferred to suggest that his inability to obey was so-called inability in a more generic, daily-life sense—as in, "I am unable to comply with your request because it would cost me a lot of money." Such an "inability" more accurately is a markedly distasteful choice, as opposed to a true obstacle.

If the board meant only the latter, its report would not seem to raise the defense of inability. Undoubtedly, appellant's personal life made deployment at that time an exceedingly difficult duty that would impose significant personal and family hardship. Such pain is humanly understandable, but it is not an available legal defense to a valid military order.

If the board meant the former, however, its report would seem to raise a viable defense of inability. In other words, appellant was *physically unable* to obey the order to deploy for a reason that was no fault of his own, *viz.*, his "adjustment disorder with mixed emotional features ... of depression and ... profound anxiety."[1] While not *nec-*

---

1. A couple of comments are appropriate here in response to the majority's implied limitations on the availability of this defense under circumstances like these. 41 MJ at 154.

First, the fact that expert witnesses did not agree with each other on the facts of this case is not relevant. An accused is entitled to an instruction on any defense reasonably raised by the evidence—it does not have to be compellingly persuasive or uncontradicted.

Second, it is not relevant, either, that the experts agreed that appellant did not suffer a psychosis or mental illness and that no issue was raised of mental responsibility within the meaning of RCM 916(k), Manual for Courts–Martial,

United States, 1984 (Change 3). Nothing in RCM 916(i) fairly imposes the very strict limits of mental responsibility under RCM 916(k). All that must be shown is that an accused is physically unable to obey an order, through no fault of his own; it is not outside the boundary of a fair reading of that rule that the "fault" could be a mental or emotional condition that is not a "severe mental disease or defect," Art. 50a(a), Uniform Code of Military Justice, 10 USC § 850a(a), and, thus, does not rise to the level of lack of mental responsibility under the definition of RCM 916(k).

Finally, there is no basis in RCM 916(i) for limiting physical inability that is caused by some

*essarily* the construction that must be given the board's report, it certainly is at least as equally plausible as the other; and "[a]ny doubt" whether evidence reasonably raises an affirmative defense requiring instruction *sua sponte,* " 'should be resolved in favor of the accused.' *United States v. Steinruck,* 11 MJ 322, 324 (CMA 1981)." *United States v. McMonagle,* 38 MJ 53, 58 (CMA 1993).

### B. Was inability subsumed within other instructions?

The majority

hold[s] that under the facts of this case where lack of mental responsibility is asserted as a defense to disobedience of an order and the defense of physical inability is inextricably tied to the defense of lack of mental responsibility, an instruction on lack of mental responsibility precludes the necessity of an instruction on physical inability.

41 MJ at 155. To appreciate the flaws in this conclusion, it must be understood precisely what constitutes "the defense of lack of mental responsibility" and what constitutes "the defense of physical inability" that allegedly is caused by a psychological condition, especially in the context of this case.

RCM 916(k)(1) (Change 3) defines the former defense as one where, "at the time of the commission of the acts constituting the offense, the accused, as a result of a *severe mental disease or defect,* was *unable to appreciate the nature and quality or the wrongfulness* of his or her acts." (Emphasis added.) RCM 916(i) defines the latter defense as one where an accused "refus[es] or

fail[s] to perform a duty that the accused was, *through no fault of the accused, not physically or financially able to perform.* ..." (Emphasis added.) The only requirements of the inability are that it not be through fault of the accused and that it must render him physically or financially unable to perform. Where the claimed cause of the physical inability, as here, is some psychological problem, there is no basis in law or logic to require that that psychological problem must rise to the level of a "severe mental disease or defect." *See* Art. 50a(a), UCMJ, 10 USC § 850a(a). Neither is there any basis in law or logic to require that the psychological problem render the accused "unable to appreciate the nature and quality or the wrongfulness of the acts"—Art. 50a(a); [2] all that is required is that the problem render the accused physically unable to perform.

In the context of this case, a sanity board reported that, due to an adjustment disorder with mixed emotional features of depression and profound anxiety, appellant was rendered unable to obey the order to deploy. Most surely, the psychological difficulties thus described do not amount to a "severe mental disease or defect"; equally surely, it did not render him "unable to appreciate the nature and quality or the wrongfulness of the acts." Yet, it might well have been found, under proper instruction, to have caused a physical inability to obey.

Accordingly, I cannot agree with the majority that "an instruction on lack of mental responsibility precludes the necessity for an instruction on physical inability." 41 MJ at

psychological condition to a condition that is "combat induced." While the majority opinion in *United States v. Latsis,* 5 USCMA 596, 601, 18 CMR 220, 225 (1955), did refer to "physical inability resulting from a combat-precipitated psychiatric disorder," that simply was the fact of that case; nothing in that opinion fairly can be read to limit the psychological trigger of the physical inability to one resulting from combat.

**2.** Actually, the military judge did not instruct on lack of mental responsibility but, instead, on *partial* lack of mental responsibility. Specifically, pointing to evidence questioning "whether [appellant] knowingly understood what behavior was expected of him," the military judge in-

structed: "If the accused, because of his condition, wasn't able to understand the words spoken by Captain Andersen, then you must find him not guilty of the offense if his belief was reasonable given his state of mind." *But cf.* RCM 916(k)(2) (Change 3) ("A mental condition not amounting to a lack of mental responsibility under subsection (k)(1) of this rule is not a defense, nor is evidence of such a mental condition admissible as to whether the accused entertained a state of mind necessary to be proven as an element of the offense."). Of course, it is not appellant's ability to *understand* the order to deploy which is at the focus of the defense of inability; rather, it is his ability to *obey.*

155. As the majority recognizes, "Appellant's trial strategy beginning with *voir dire* was to prove that appellant was unable to obey the order to deploy because he was suffering from anxiety and depression[,]" 41 MJ at 153, not to prove that appellant was insane. Thus, quite apart from whether he satisfied the very strict requirements of RCM 916(k)(1), appellant was entitled to have the members decide from the evidence whether in fact his psychological problems identified by the sanity board were such that he was rendered physically unable to obey the order to deploy. I would give him that opportunity in a rehearing.