# United States Navy–Marine Corps Court of Criminal Appeals

Before
HOLIFIELD, STEWART, and STARITA
Appellate Military Judges

———————————

**UNITED STATES**
*Appellee*

**v.**

**Jose E. WAGNER**
Gas Turbine System Technician (Mechanical) Fireman (E-3),
U.S. Navy
*Appellant*

**No. 202000124**

Decided: 27 September 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Stephen C. Reyes

Sentence adjudged 21 February 2020 by a general court-martial convened at Fleet Activities Yokosuka, Japan, consisting of officer and enlisted members. Sentence in the Entry of Judgment: reduction to paygrade E-1, 3 months' hard labor without confinement, and a dishonorable discharge.

For Appellant:
*Major Anthony M. Grzincic USMC*

For Appellee:
*Captain Nicole A. Rimal, USMC*
*Lieutenant Gregory A. Rustico, JAGC, USN*

Senior Judge HOLIFIELD delivered the opinion of the Court, in which Judge STEWART joined. Judge STARITA filed a separate dissenting opinion.

––––––––––––––––––––––––

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

––––––––––––––––––––––––

HOLIFIELD, Senior Judge:

Appellant was convicted, contrary to his pleas, of one specification of sexual assault by causing bodily harm in violation of Article 120, Uniform Code of Military Justice (2012) [UCMJ (2012)].[1] In his sole assignment of error, Appellant asserts that the evidence is factually insufficient to support his conviction.

We find no prejudicial error and affirm.

## I. BACKGROUND

On 8 November 2017, four Sailors—Quartermaster Second Class (E-5) [QM2] Mast[2] (the victim), Boatswain's Mate Second Class (E-5) [BM2] Bravo, Gunner's Mate Second Class (E-5) (GM2) Sierra, and Gunner's Mate Third Class (E-4) [GM3] Romeo—were temporarily assigned to USS *Ashland* (LSD 48). During a port call in Sasebo, Japan, the four Sailors agreed to share a hotel room and go out as a group that night. Accompanying them was a friend of BM2 Bravo and that friend's friend, Appellant, who was not previously known to the group of four.

During the evening, Appellant approached QM2 Mast and expressed an interest in her, as well as his belief that the attraction was mutual. Petty Officer Mast rebuffed his advances, stating that she was married and not interested in Appellant.

––––––––––––––––––––––

[1] 10 U.S.C. § 920(b)(1)(B) (2012).

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

Petty Officers Sierra and Romeo were the first of the group to return to the hotel room. Neither was intoxicated. Sometime later, when a very intoxicated BM2 Bravo was ordered to leave the bar where the remaining Sailors were, QM2 Mast and another Sailor helped BM2 Bravo back to the hotel room. Once there, BM2 Bravo passed out on one of the twin beds. As GM2 Sierra and GM3 Romero were asleep in the other bed, QM2 Mast lay down on the couch.

Sometime later, Appellant came to the room claiming he had lost his friend and could not remember his room number. Petty Officer Mast told him to stay, as it was nearing their curfew. She repeated this advice when Appellant again sought to leave. At this point, Appellant pushed QM2 Mast down onto the bed next to BM2 Bravo and repeated his earlier claim: "I like you and I know you like me."[3] Despite QM2 Mast's verbal and physical protestations, Appellant proceeded to lay on top of her and commence sexual intercourse. The noise of QM2 Mast's protests woke GM2 Sierra, who then woke GM3 Romeo. The latter heard a "slapping sound" which he attributed to sexual intercourse, and both testified they heard QM2 Mast telling Appellant to stop and get off of her. Petty Officer Sierra began shouting at Appellant and telling him he had to leave, which he soon did. BM2 Bravo remained unconscious throughout the event.

The next morning, GM2 Sierra accompanied QM2 Mast to the hospital, where QM2 Mast filed a restricted sexual assault report. She then contacted Appellant, asking whether he had a sexually transmitted infection [STI]. Appellant claimed ignorance of the previous night's assault and denied that he would ever do such a thing. The next day, however, he went to medical seeking an STI test, claiming he had had sex with a local national the night before.

Additional facts necessary to resolve the AOE are addressed below.

## II. DISCUSSION

Appellant asserts the evidence is factually insufficient to support his conviction. We review such questions de novo.[4] In evaluating factual sufficiency, we determine "whether, after weighing the evidence in the record of trial and

---

[3] R. at 233.

[4] Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2018) [UCMJ (2018)]; *cf. United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

making allowances for not having personally observed the witnesses, [we] are . . . convinced of the [appellant's] guilt beyond a reasonable doubt."[5] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[6] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[7]

Appellant was convicted of sexually assaulting QM2 Mast. In order to prove this offense as charged, the Government was required to prove that: (1) Appellant committed a sexual act upon QM2 Mast by causing bodily harm to her;[8] (2) that Appellant did so by penetrating QM2 Mast's vulva with his penis;[9] and (3) that Appellant did so without QM2 Mast's consent.[10]

"Bodily harm" in the context of Article 120, UCMJ (2012), means "any offensive touching of another, however slight, including any nonconsensual sexual act."[11] "Consent" is defined as "a freely given agreement to the conduct at issue by a competent person."[12] "Lack of consent may be inferred based on the circumstances of the offense."[13]

Appellant challenges the factual sufficiency of his conviction, claiming it was "based on inconsistent witnesses and an implausible story."[14] We disagree.

We are convinced beyond a reasonable doubt that Appellant committed the sexual act without QM2 Mast's consent. While the various descriptions of the night's myriad events are not in lock-step agreement, they do agree where relevant to the elements of the charged offense. And the witnesses

---

[5] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[6] *Washington*, 57 M.J. at 399.

[7] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[8] Article 120(b)(1)(B), UCMJ (2012).

[9] Article 120(g)(1)(A), UCMJ (2012).

[10] Article 120(g)(3), UCMJ (2012).

[11] *Id.*

[12] Article 120(g)(8)(A), UCMJ (2012).

[13] Article 120(g)(8)(C), UCMJ (2012).

[14] Appellant's Br. at 9.

remained consistent on these points throughout the 27 months between the assault and court-martial. While many allegations of sexual assault involve only the conflicting statements of the alleged victim and the alleged offender, the present case involves two independent eyewitnesses. One testified to what he unequivocally described as the sounds of sexual intercourse, and both testified to QM2 Mast's clear expressions of her lack of consent. In both instances, their testimony corroborated that of the victim.

The victim gave compelling testimony describing how Appellant pushed her onto the bed, pulled down her pants, and penetrated her despite her clear protests. Appellant claims it is implausible that the forcible sexual assault alleged by the victim could occur in a twin bed without waking the third person sleeping in the bed. But the facts here do not fit Appellant's character-ization. Witnesses agreed that the extremely intoxicated BM2 Bravo was passed out, not just sleeping, and QM2 Mast's attempts to stop Appellant *were* loud enough to wake the two sober Sailors asleep in the room. Given QM2 Mast's testimony, and the generally corroborative evidence presented at trial, we are convinced that the sexual act occurred and was nonconsensual. In sum, the evidence conclusively proves each element of Article 120(b)(1)(B), UCMJ (2012).

As our colleague points out in his dissent, some evidence at trial was not entirely consistent with the above description of events. But we find these inconsistencies in testimony thoroughly outweighed by the evidence as a whole. We disagree that the evidence fails to exclude the possibility that Appellant and QM2 Mast engaged in a consensual sexual act, and that QM2 Mast made a false allegation of assault in order to protect her marriage. There was no evidence indicating QM2 Mast had any interest in such a consensual act; to the contrary, the uncontradicted evidence at trial was that she had declined Appellant's earlier overtures, denying that his interest in her was mutual and reminding him that she was married. We disagree that the alternative explanation that QM2 Mast soon thereafter changed her mind and engaged in consensual sex with Appellant in a room where three other Sailors slept constitutes a "fair and rational hypothesis" raising a reasonable doubt as to Appellant's guilt.

The dissent also cites discrepancies in testimony regarding QM2 Mast's and Appellant's respective states of undress, finding that the controverted evidence of their near-nakedness supports the possibility that the sex was consensual. Again, we disagree. Considering the full body of evidence, and for the reasons given above, we find this discrepancy to be of insufficient weight to rescue an otherwise unreasonable hypothesis.

Finally, the dissent cites GM2 Sierra awakening as a potential reason for QM2 Mast to tell Appellant to stop their sexual activity. But this puts the

cart before the horse. GM2 Sierra testified that it was QM2 Mast's protests—"in a low voice saying 'no' and 'stop'"—that caused her to awake.[15] Thus, rather than provide a motive for QM2 Mast to suddenly voice a lack of consent, the order of events corroborates QM2 Mast's claim that the act was nonconsensual.

Weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced the evidence presented at trial was factually sufficient to support Appellant's conviction. We are, in fact, also convinced of Appellant's guilt beyond a reasonable doubt.[16]

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[17] The findings and sentence as approved by the convening authority are **AFFIRMED**.

Judge STEWART concurs.

---

[15] R. at 340.

[16] Although the sole AOE was limited to factual sufficiency, we also conducted our required review for legal sufficiency and find the evidence is legally sufficient to support the conviction, as well. Article 66(d), UCMJ (2018).

[17] Articles 59 & 66, UCMJ (2018).

STARITA, Judge (dissenting):

I respectfully disagree with my colleagues that the evidence is factually sufficient to support Appellant's conviction. Having carefully reviewed the record of trial and making allowances for not having personally observed the witnesses, I conclude that the Government failed to meet its burden of proving Appellant's guilt beyond a reasonable doubt. "Reasonable doubt" is not "a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it . . . ."[18] The evidence in this case does not exclude "every fair and rational hypothesis except that of guilt."[19] As such, I would set aside the findings and sentence.

In our unique role as appellate jurists, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[20] I understand and respect my colleagues' conclusion that evidence was presented on each element of the offense of conviction. It is the nature and quality of that evidence that is concerning. I considered the evidence in its totality and, as discussed below, it supports at least one "fair and rational hypothesis except that of guilt"[21]—that QM2 Mast and the Appellant were engaged in some form of a consensual sexual encounter and that QM2 Mast's claims to the contrary were the result of her desire to protect her marriage and family.

As an initial matter, I am compelled to acknowledge that the evidence suggests that all of the witnesses, including QM2 Mast and Appellant, had been drinking and were intoxicated to varying degrees. This, along with the more than two years that passed between the date of the incident and the date of the trial,[22] helps explain the many conflicts in the testimony presented at trial, but does not excuse them.

---

[18] *United States v. Meeks*, 41 M.J. 150, 155 (C.A.A.F. 1994) (affirming propriety of the military judge's definition of "reasonable doubt").

[19] *Id.*

[20] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[21] *Meeks*, 41 M.J. at 155.

[22] The alleged sexual assault occurred on 9 November 2017 and the trial occurred on 18–21 February 2020.

First, QM2 Mast testified unequivocally that Appellant sexually assaulted her. She testified that on the night in question Appellant did not accompany her back to the hotel room she shared with GM2 Sierra, GM3 Romeo, and BM2 Bravo, but that he instead came to the hotel room because he could not find his own room. QM2 Mast testified that prior to the sexual assault Appellant slept on the couch for a little while, then attempted to leave the room but she told him to stay because she did not want him to violate curfew. She further testified that after she told him not to leave the room, Appellant pinned her to the bed using his bodyweight, that he held her hands above her head with one hand while he used his other hand to pull down her jeans, and that Appellant's penis penetrated her vagina. QM2 Mast testified that she was fully clothed at the time of the assault, wearing two shirts, a bra, panties, and jeans on the evening in question. She testified that Appellant managed to pull her jeans down just enough to accomplish sexual intercourse using one hand, while using his other hand to pin her to the bed. According to QM2 Mast, Appellant was also fully clothed when the assault began and he unbuttoned his pants during the assault.

Having carefully read the account, QM2's description of the sexual assault is at best hard to believe and at worst physically impossible. Specifically, QM2 Mast's testimony that Appellant pinned her arms above her head with one hand and then pulled her jeans down with his other hand all while he had his full weight pushing down on her mid-section is particularly hard to believe when one considers the relative size of QM2 Mast and Appellant. Petty Officer Mast testified that she is five foot seven inches tall. She claimed at the time of trial that she weighed 100 pounds, but admitted that she told NCIS at the time of her interview that she weighed 118 pounds. Her testimony regarding her weight fluctuation suggests an appreciation that her description of the assault juxtaposed with the size and weight of Appellant[23] creates doubt about the accuracy of her description of the relevant events.

Petty Officer Mast's claims of sexual assault are supported by GM2 Sierra's testimony. GM2 Sierra testified that she heard QM2 Mast at some point say "no, stop" several times in a low voice while she was passed out in the adjacent bed—just feet away. To be clear, GM2 Sierra was not awoken by

---

[23] While no witness directly testified to the exact height and weight of Appellant, civilian defense counsel claimed in both opening and closing arguments that Appellant stood five foot eight inches and weighed 135 pounds. These claims were never contradicted by the Government. While not admitted as evidence and we do not consider it on appeal, we recognize that the members were able to observe the physical stature of Appellant for themselves.

loud cries for help. Rather, she testified that she heard QM2 speaking in a low voice and she thought QM2 was talking in her sleep. GM2 Sierra further testified that she did not immediately jump out of bed and run to QM2 Mast's aid, but instead nudged GM3 Romeo to wake him up. While GM2 Sierra's testimony corroborates that QM2 Mast told Appellant to stop, it does not necessarily establish that nonconsensual sexual intercourse occurred. This evidence equally supports the hypothesis previously stated—QM2 Mast and Appellant were engaged in consensual sexual encounter and she requested that Appellant stop. It also supports another fair and rational hypothesis: that Appellant was attempting to engage in some form of sexual activity short of the charged conduct, to include removing her pants, and she requested that Appellant stop.

Additionally, GM2 Sierra also testified that she got out of bed and "went into, like, a rage."[24] GM2 Sierra testified that from this point on she could remember seeing faces but she could not remember any other details about the encounter. She did not remember if either QM2 Mast or Appellant were clothed or if lights were on in the room, nor could she shed light on the other important contradictions between QM2 Mast's testimony and GM3 Romeo's testimony. Most importantly, GM2 Sierra was unable to provide any testimony on whether a sexual encounter occurred, consensual or nonconsensual, while certainly in physical proximity to have witnessed it.

In contrast to GM2 Sierra's testimony, GM3 Romeo's testimony offered substantial details about what occurred in the room, but conflicted with QM2 Mast's claims in a number of important ways. In contrast to QM2 Mast's claim that she and Appellant were fully clothed and that Appellant pulled QM2's pants down just far enough to accomplish the sexual act, GM3 Romeo testified that Appellant was completely naked and QM2 Mast was only wearing a bra. Notably, GM3 Romeo was only caused to stir and investigate the goings-on in the hotel room because GM2 Sierra woke him up. GM3 Romeo did not testify that he heard anyone say stop in a low voice as GM2 Sierra did, but instead woke to observe QM2 telling Appellant to get off of her. GM3 Romeo also testified that he heard sounds consistent with sexual intercourse but never saw sexual intercourse. While GM3 Romeo's observation of QM2 Mast telling Appellant to get off of her is consistent with the Government's theory of sexual assault, it is equally consistent with the theory that QM2 Mast was telling Appellant to stop because she realized that GM2 Sierra was waking up and would observe her having an extra-marital

---

[24] R. at 341.

affair. GM3 Romeo's testimony also reveals that he made certain assumptions about what had transpired between QM2 Mast and Appellant. He testified that he concluded there must have been some sort of sexual assault but was only told so by QM2 Mast the following day. GM3 Romeo's interpretation of what he observed was influenced by QM2 Mast's claims to him that a sexual assault occurred.

However, when focusing on what GM3 Romeo actually observed and not what he assumed or was told by QM2 Mast, his testimony contradicts important details of QM2 Mast's claims and supports the rational hypothesis that something other than the charged conduct occurred between QM2 Mast and Appellant. In addition to contradicting QM2 Mast's claims regarding her state of dress, GM3 Romeo also testified that Appellant accompanied QM2 Mast back to the hotel room that night, disputing QM2 Mast's claims to the contrary. Additionally, both GM3 Romeo and GM2 Sierra testified that Appellant's friend knocked on the door shortly after Appellant left the room in order to look for Appellant's Common Access Card [CAC]. Appellant's apparent direct return to his own room and his friend immediately coming to QM2 Mast's hotel room to look for Appellant's CAC contradict QM2 Mast's claim that Appellant was only in the room because he did not know where his own room was located.

Further, the detail most difficult to square with QM2 Mast's claim of sexual assault is the fact, corroborated by GM3 Romeo, that QM2 Mast insisted that Appellant remain in the hotel room before and after the alleged assault to avoid a curfew violation. According to both QM2 Mast and GM3 Romeo, the two of them had to calm down GM2 Sierra and explain that Appellant could not leave the room because of curfew. Why, after being rescued by her friends from a forcible sexual assault, would QM2 Mast insist that Appellant remain in the room to avoid a curfew violation? This particular behavior defies common sense.

Finally, there is QM2 Mast's visit to medical the next morning. Petty Officer Mast testified at trial that her friends asked her immediately following the assault if she wanted to go to the hospital. She declined. On direct examination, when asked why she went to medical the following morning, QM2 Mast explained that she needed a Plan B and to make sure she did not have a sexually transmitted infection [STI]. She explained that she was experiencing pain in her abdomen, as well as pain when she urinated. Although she initially tested positive for an STI, it later turned out that the test was a false positive and that she instead had a urinary tract infection. Also, while at medical, QM2 Mast was offered a sexual assault forensic examination and she declined, which is her right. However, in doing so, the finders of fact were deprived of evidence that could have corroborated a nonconsensual

sexual encounter. While not dispositive, this does create a much closer case. Petty Officer Mast had a husband and young child at home, so it is possible that she had concerns that a consensual sexual encounter resulting in a STI would be difficult for her to explain to her husband. One could reasonably conclude from the record before us that QM2 Mast went to medical the following day, not to report a sexual assault, but to ensure that she would not take an STI home to her family.

Having been asked whether the evidence in this case proves every element of the crime beyond a reasonable doubt, I cannot answer in the affirmative. Petty Officer Mast's description of the sexual assault, her motive to fabricate a story of sexual assault rather than admit to extramarital sexual conduct, the conflicts in testimony regarding whether Appellant accompanied QM2 Mast back to her hotel room, QM2 Mast and Appellant's states of dress, and QM2 Mast's behavior after the sexual assault do not exclude the fair and rational hypothesis that QM2 Mast engaged in a consensual sexual act with Appellant, albeit a drunken one, that she removed her own clothing or allowed Appellant to do so, and that when discovered she claimed otherwise in order to protect her reputation and marriage. Being unable to call this hypothesis "a fanciful or ingenious doubt or conjecture," [25] I conclude that the findings and sentence should be set aside.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[25] *Meeks,* 41 M.J. at 155.